# First National Bank of Carlisle *versus* Graham.

1. Collateral facts incapable of affording reasonable presumption as to the principal matter in dispute, are inadmissible as evidence, as tending to draw the minds of the jury from the issue and to prejudice and mislead them.

2. Where a bailment is for the sole benefit of the bailor the bailee is answerable only for gross neglect; when solely for the benefit of the bailee he is responsible for slight neglect; when reciprocally beneficial to both, the bailee is responsible for ordinary neglect.

3. A bailee keeping the property of the bailor with the ordinary care with which he keeps his own, does not fulfil his duty, if the contract requires strict diligence and extraordinary care.

4. Where the benefits are reciprocal, the bailee is liable for neglect of ordinary care, although he has been careless and reckless in the management of his own goods as well as those of the bailor.

5. That the bailee has dealt with his own goods and the bailor's in the same way, is evidence in adjusting the standard of duty and deciding the question of performance, and as a test of the bailee's good faith. It would raise a presumption of adequate diligence.

6. The measure of the bailee's responsibility is to be determined in each case by a comparison with the conduct of classes of men, not of individuals.

7. The mere voluntary act of the cashier of a bank in receiving securities for safe-keeping, will not render the bank liable for their loss; but if the deposit be known to the directors and acquiesced in, the bank will be liable.

8. Scott *v.* National Bank of Chester Valley, 22 P. F. Smith 471, considered. Tompkins *v.* Saltmarsh, 14 S. & R. 275, followed.

May 26th 1875.  Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Cumberland county:* Of May Term 1875, No. 72.

This was an action of assumpsit, brought October 13th 1873, by Fannie L. Graham against the First National Bank of Carlisle, to recover the value of four United States 5–20 bonds of $1000 each, which had been left by her with the bank for safe-keeping, and for which there was given to her a receipt as follows :—

" Carlisle, Pa., October 22d 1868.

Miss F. L. Graham has left in this bank, for safe-keeping, four thousand dollars in U. S. 5–20 bonds of 1867, to be returned on the return of this receipt.

CHARLES H. HEPBURN, Cashier."

When the plaintiff demanded the bonds, they were not delivered to her, the officers of the bank informing her that they had been stolen, August 5th 1871, from the vault of the bank, with other

[First National Bank of Carlisle *v.* Graham.]

valuables. The plaintiff, alleging that the bonds had been lost through the negligence of the defendant, brought this suit.

The case was tried January 16th 1874 before Junkin, P. J.

The plaintiff testified that she deposited the bonds with the bank for safe-keeping; she had also similarly deposited bonds on an association in Monmouth, Illinois. About three or four weeks after the robbery, she learned from a brother residing in Monmouth that the association there had been notified that the bonds had been stolen; she went to the bank to inquire and was informed by C. H. Hepburn, the cashier, that the Monmouth bonds had been recovered. She then asked about her United States bonds, and he told her they had been stolen, "but I should say nothing about them, and keep quiet—that was their loss and not mine. Soon afterwards, not feeling satisfied, I went to the judge (S. Hepburn, Sr., who was the president); I think Charles said to keep quiet, and in that way they might discover who took them; when I saw the judge he assured me that I should not lose a cent— that they could afford to lose it and I could not, and said that I should not say anything about it; I saw him a number of times after that and he always assured me I should not lose it, but still gave me no security; they, Charles and the judge, told me to come on and draw my interest." She first knew of the loss in September 1871. They continued to credit her account with the interest on the bonds, the same as before the loss; the last credit was July 12th 1873.

Plaintiff gave evidence that on August 5th 1871, S. Hepburn, Sr., S. Hepburn, Jr., J. G. Orr, C. H. Hepburn, and H. Hepburn, were directors. S. Hepburn, Sr., was president, C. H. Hepburn was cashier and J. G. Orr was teller. The stockholders were the same as the directors; S. Hepburn, Sr., owned 460 shares of the stock, each of the others owned 10 shares.

It was admitted that United States government bonds were received by the bank for safe-keeping, with the knowledge of the president, cashier and teller, and received without compensation; that the bank collected the coupons without compensation; that they were received by the cashier, and that the coupons were sometimes paid to the owner in cash, and sometimes deposited to his credit; that coupons were sent by the bank to Philadelphia for collection, and were collected in the name of the bank, and then the bank either paid the owner the cash or credited his account; that these collections were made at the request of the owners of the bonds. There was no meeting of the directors for discount purposes from 8th February 1870 until 1st October 1873, when the board met and resolved to close the bank.

John G. Orr, teller, testified for defendants: "The bonds lost were kept in the safe inside the vault on an upper shelf in the safe inside the interior iron drawer, and money was kept in the depart-

[First National Bank of Carlisle *v.* Graham.]

ment below the bonds, and these bonds were kept just as we kept the other money and valuables of the bank; the first I knew of the disappearance of the bonds was on the afternoon of 5th August 1871 ; a short time before 3 o'clock I went down to the court-house to the election, and after being there half an hour, some one came in and told me that I was wanted up at the First National Bank; I went up and found Charles Hepburn, the cashier, and Judge Hepburn, the president, there, and the cashier informed me that nearly all the money of the bank had been taken, and asked me if I knew anything about it; I said I did not, and then I went into the vault and found that nearly all the money that was in the safe was gone, except a few packages of $1 and $2 notes ; * * * I asked the cashier if he had looked to see whether the bonds were there ; he said not, and I then went into the vault and looked and found that the package of bonds and some other papers were gone ; we then examined and found a large pocket-book was also gore ; in this pocket-book were the bonds of the president, cashier and teller, and some other papers ; there was no money in that. * * * Judge Hepburn said it would be better not to say anything about it ; it might cause a run on the bank." * * *

C. H. Hepburn, the cashier, testified that the bonds were left in the original envelope in which they came from Washington ; they were tied up in a bundle with other securities left for safe-keeping by other persons ; the bundle was in a safe above the place where they kept their money, all within an iron door within the safe ; the safe was a Lilly burglar-proof safe with combination lock ; the inside door had a combination lock. Witness then described the circumstances of the discovery of the loss somewhat more at large than Orr, but corresponding in the main with his statement. The amount of money taken was about $3500. The Monmouth bonds and some other papers were recovered. Letters were written to the Assistant United States Treasurer at New York, about the robbery, on August 9th, and about the same time to the treasury department at Washington. Witness informed the plaintiff of the loss eight or ten days after it occurred ; told her to feel perfectly easy about it and keep it quiet, so that they might be able to trace the bonds ; that he and the president had talked the matter over, and they would individually pay every cent of them ; that they would pay her interest as theretofore ; this was repeatedly said to her by him afterwards. Witness testified further as to the situation of their safe, &c., and generally as to circumstances tending to show the care exercised in custody of the bonds.

Defendants gave evidence that the papers which were restored had been found on the 5th of August 1871, about 12 o'clock M., by a man quarrying stone near the railroad at Bridgeport, eighteen miles from Carlisle.

In rebuttal the plaintiff gave evidence from other witnesses of

[First National Bank of Carlisle v. Graham.]

the request of the officers of the bank to keep the robbery secret, and that at an informal meeting of the president, cashier and teller, they being also directors of the bank, it was determined to keep the matter secret, as it might be injurious to the bank.

The plaintiff then offered to prove by Mrs. Trout, that she had a deposit of government bonds in this same bank for safe-keeping; that she drew the interest and premium on her bonds regularly until the bank closed, and that, although living just opposite the bank, she never knew or heard of the alleged disappearance. This to rebut the presumption that there never was any robbery, and to show that bonds remained in bank till its close, to be followed by proof of a similar character.

This was objected to by the defendant, admitted by the court, and a bill of exceptions sealed.

The witness testified : " I had bonds in this bank, and received a receipt for them and drew interest up to July 1873; I only heard of the loss after the suspension; Charles said I should not lose."

F. S. Dinkle testified, under the same exception, that he had bonds deposited with the defendant; " I received all my money but $100 ; I did not hear of the loss of the bank until after the bank had closed."

The following are points of plaintiff with their answers :—

1. If the jury believe that the plaintiff deposited the bonds for the value of which this suit is brought, with the defendant for safe-keeping, and took the receipt of the cashier in evidence, for the same, the defendant was bound to exercise ordinary care, skill and diligence, to keep and return the same safely ; such care as men of ordinary prudence exercise in the care of their own property ; and if defendant did not use ordinary care to keep plaintiff's bonds safely, but kept the same negligently, then it is liable for their loss, and the plaintiff is entitled to recover their value.

Answer. " First point affirmed, and for the meaning of *gross* negligence, the jury is referred to the general charge."

3. If defendant was negligent, and did not exercise ordinary care, skill and caution to keep plaintiff's bonds safely, then it is liable for their value, no matter how negligent it may have been in taking care of its own property.

Answer. " Affirmed ; see general charge."

7. If the jury believe that the defendant endeavored studiously to conceal the loss of plaintiff's bonds ; did not inform her of their loss, although living in the same town, for some weeks afterwards, and then enjoined silence upon her by stating she should lose nothing ; that it would be defendant's loss, not plaintiff's ; and made no attempt to discover the alleged thief, except by procuring its attorney to write to government officers in Washington and New York, and did not telegraph or write to any bankers or brokers in

[First National Bank of Carlisle *v.* Graham.]

Pennsylvania; this is strong evidence of negligence on the part of the bank, and proper to be taken into consideration by the jury on the question of negligence.

Answer. "This point is affirmed. We have fully instructed you on this branch of the case in the general charge."

The following are points of the defendant, with their answers:—

2. The defendant being chartered under the Acts of Congress, and its objects, powers and duty being thereby defined, and no power being thereby given authorizing it to become a bailee or depositary of valuables, in the manner alleged by plaintiff, the act of the cashier in so receiving such valuables would not make the bank liable to the plaintiff, and she cannot recover.

Answer. "We have already told you that the bank is liable only where these special deposits are received from time to time, with the knowledge of its directors. If they were so received in this case, the bank is liable, if gross negligence has been shown."

4. Even if the bank could legally become a bailee, as alleged by plaintiff, the proof being clear that no compensation was paid for keeping it, and that it was taken and kept at the request of the plaintiff for her own convenience, the plaintiff cannot recover, unless she shows that the defendant was guilty of gross negligence; and the test of good faith and want of gross negligence is: "Did the bank keep the deposit with the same care and security as it did its own property?"

Answer. "Affirmed; except that the deposit must be kept with the same care that an ordinarily prudent man would keep his own of like kind and value."

7. If the plaintiff, after being informed of the loss of the bonds, acquiesced in the silence of the officers of the bank as to the loss, and concurred therein, she is guilty of concurrent negligence, and cannot recover upon the ground that the bank did not give notice of the loss.

Answer. "We cannot answer as requested. Her agreeing to keep silence is not concurrent negligence in the sense of that term. The effect of inducing her to keep silence cannot affect the questions on which the case turns. It is a question of gross negligence on the part of the bank, and she could do nothing by her agreement to maintain silence which could affect the question of gross negligence."

The court charged:—

* * * "No compensation was to be received for the care of this deposit by the bank. It was therefore a naked bailment without reward, and without any special undertaking, which, in the civil and common law, is called what this really was, *depositum;* the bailee will be answerable only for *gross negligence*, which is considered equivalent to a breach of faith, as every one who receives the goods of another in deposit impliedly stipulates that he

[First National Bank of Carlisle *v.* Graham.]

will take some degree of care of them. The degree of care which is necessary to avoid the imputation of bad faith is measured by the carefulness which the depositary uses towards his own property of a similar kind; so that the doctrine may be regarded as well settled, upon authority and reason, that where one makes a simple deposit in which there is an accommodation to the party making it, and the advantage is to him alone, he shall be the loser, unless the person to whom he intrusted the deposit has shown bad faith, in exposing the goods to hazards to which an ordinarily prudent man would not expose his own; and only when it is shown that the bailee has kept the goods or deposit in such a manner as no ordinarily prudent man would keep his own, is he guilty of *gross* negligence, and only when this is shown is he guilty of such neglect as renders him liable for the value.

" [*Gross* negligence is the omission of those precautions which persons of common care and common prudence would naturally adopt, even though they might, in reference to their own goods, omit them; so that the test of *gross* negligence is not simply: ' Did the bailee take as much care to preserve from loss the property bailed, as he did of his own?' for he might be grossly careless of his own; ' but did he take that kind of care which persons of common care (customary care) do take of their own ?']

" Good faith requires that the bailee should take *reasonable* care of the deposit, and what is reasonable care must materially depend upon the nature, value and quality of the thing, and the circumstances under which it is deposited, and upon the character and confidence and particular dealings of the parties. He is bound to exercise a degree of care proportioned to the nature and value of the article ; the danger of loss, and the temptations to theft; and if he take the same care of the goods bailed as he did or does of his own, that will ordinarily repel the presumption of *gross* negligence. The desire to preserve one's own property from loss from any cause is, as a rule, so universal that the mind rests with satisfaction upon that evidence which shows the same care of the bailed property that the bailee took to save his own, unless it is shown that he was grossly negligent of both, and when this is done he is not excused, but held answerable. With these simple rules for your guidance, we will do what we can to aid you in their application to this case." * * *

The court then recapitulated the evidence in the case and proceeded:—

" [The evidence offered to repel the alleged theft is the fact that Dinkle and Mrs. Trout, who had bonds in this bank, went there and drew their interest as before. Dinkle had $700 in bonds, and from time to time kept lifting them, by the bank paying him the cash for them—the same as if the bonds were still there ; but he saw no bonds—he was paid money. The explanation offered for

this apparent inconsistency is this : That after the loss was detected the Messrs. Hepburn, on consultation, resolved to assume the loss, and keep it quiet, lest the bank would be run upon. Now does this account for what otherwise seems unaccountable, and explain why they continued to treat the bond-owners just as they had done before ?] * * * [Banks would be somewhat embarrassed if it were held for law that they must not open their vaults to transact their own business, for fear some bond depositor, who pays nothing for the care of his property, might lose his bond. He must incur that risk or remove his bond into his own possession, and this is altogether reasonable.]

"Should you find that there was a larceny of the plaintiff's bonds on that 5th day of August 1871, and that thus the bonds were lost, with no gross negligence on the part of the officers of the bank having the care of its deposits, this plaintiff should not recover ; *unless*, however, that it is found that the plaintiff was prejudiced by the neglect of the bank to give her immediate notice of the loss, as we will hereafter explain more fully.

"It is clear that the plaintiff's bonds were kept in the inner iron box within the safe, which itself was within the vault in the same place, and under the same securities that the money and valuables of the bank were kept. More than this could not be expected with reason ; and more than this the plaintiff could not expect, as she paid nothing for the security, and the bank was not an insurer. [The bank was not bound, from the nature of the relation between it and the plaintiff, to resort to extraordinary measures to secure her bonds, but only to keep them with ordinary and customary care, as ordinarily careful persons keep the like kind of property.] * * *

"[Should no gross negligence be found by you on the part of the defendant in caring for the plaintiff's bonds, then you must look into the effect of the neglect on the part of the defendant to give this lady immediate notice of the loss.] The rule of law is, that where the bailee accounts for a loss, in a way not to implicate himself in a charge of negligence, this is a sufficient defence ; *unless* the plaintiff *proves* negligence.

"Now, what is the precise effect of the failure of the bailee to give the bailor notice of the loss ? [My first impression was that it might be treated as absolute proof of negligence ; but, on careful reflection, it seems to me that this would be carrying the inference too far, and that reason requires that it should be limited to raising a presumption of negligence, which presumption may be repelled ; but even when thus repelled and rebutted, it still remains a question for the jury to determine whether any injury resulted to the plaintiff from the neglect of the defendant to give her notice of the loss. If you are satisfied that the bank, from prudential motives, either from the honest belief that publicity would

[First National Bank of Carlisle v. Graham.]

only diminish the chances of the recovery of the bonds, &c., or from the fear that there might be a panic among the depositors, or from both, and this resulted in no injury to this lady, by preventing her from adopting measures for their recovery, then we see nothing in the want of notice which would render the bank liable. If, however, there was a reasonable probability that her own efforts would have resulted to her advantage in the recovery of the bonds, and thus injury resulted to her, then the bank is liable and she should recover. Is it probable that she herself could have been more successful in her efforts in this direction than the bank? This is an important inquiry, and if it is reasonably certain to your minds that this lady would have recovered the property had the loss been immediately made known to her, the neglect of the bank to give the notice would make the defendant liable; if, on the other hand, no such benefit would have been likely to result to her from such notice, we do not see that the failure to give it should *per se* render the bank liable; and it would be injustice to hold the latter to responsibility for that which, if given, would have been fruitless to the plaintiff.]

["And, furthermore, should you find that had the bank itself taken more efficient measures to advertise the loss, employing detectives, &c., and there was a reasonable probability that the loss would have been recovered, that should make them liable."] * * *

The verdict was for the plaintiff for $4790.

The defendant took a writ of error, and assigned for error:—

1. Admitting the evidence of Mrs. Trout and Dinkle.

2–4. The answers to the plaintiff's points.

5, 6. The answers to the defendant's 4th and 7th points.

7–13. The parts of the charge in brackets.

14. The charge as a whole tended to mislead the jury as to the law and its application to the facts in the case.

15. The answer to the defendant's 2d point.

*S. Hepburn, Jr.*, and *W. F. Sadler*, for plaintiff in error.—As to the first error, they cited Smith *v.* First Nat. Bank of Westfield, 99 Mass. 605. The definition of *gross* negligence as given by the court below is but the definition of *ordinary* negligence: Jones on Bailment 21, 22, 47 ; Tompkins *v.* Saltmarsh, 14 S. & R. 279 ; Phila. & R. Railroad *v.* Spearen, 11 Wright 300 ; Coggs *v.* Bernard, 1 Ld. Raym. 909 ; Foster *v.* Essex Bank, 19 Mass. 479 ; Pack *v.* Alexander, 3 M. & C. 789 ; Lloyd *v.* W. Branch Bank, 3 Harris 176 ; Scott *v.* Nat. Bank of Chester Valley, 22 P. F. Smith 471. Under the facts in this case the question of negligence was a question of law : Pitts., F. W. & Ch. Railroad *v.* Evans, 3 P. F. Smith 250; Howard Express Co. *v.* Wile, 14 Id. 206 ; Glassy *v.* Hestonville Railroad, 7 Id. 172 ; N. Penna. Railroad *v.* Heileman,

29 P. F. Smith—8

[First National Bank of Carlisle v. Graham.]

13 Wright 60 ; McCully v. Clarke, 4 Id. 406 ; Penna. Can. Co. v. Bentley, 16 P. F. Smith 34 ; Lance v. Griner, 3 Id. 206.

On the 15th assignment of error, they cited Lloyd v. W. Branch Bank, 3 Harris 176 ; Merchants' Bank v. State Bank, 10 Wall. 604 ; Floyd's Acceptances, 7 Id. 667 ; U. S. Bank v. Bank of Columbus, 21 Howard 364 ; Mechanics' Bank v. Bank of Columbia, 5 Wheaton 326 ; United States v. Dunn, 6 Peters 51.

*J. Hays* and *J. H. Graham*, for defendant in error, as to the admission of Mrs. Trout's testimony, cited : Pratt v. Richards, 19 P. F. Smith 58 ; Bank v. Smith, 8 Phila. R. 76 ; Tompkins v. Saltmarsh, 14 S. & R. 280.   What is *gross* negligence is for the jury ; Doorman v. Jenkins, 2 Ad. & E. 256 ; Parsons on Cont. 89, 690 ; Addison on Cont. 627 ; Lancaster Co. Nat. Bank v. Smith, 12 P. F. Smith 54.

Mr. Justice WOODWARD delivered the opinion of the court, October 13th 1875.

On the 22d of October 1868, Fannie L. Graham, the plaintiff below, deposited United States bonds, amounting to $4000, in the First National Bank of Carlisle, for safe-keeping.   They were to be returned on the return of the receipt which was given to her by Chas. H. Hepburn, the cashier.   Never having been returned, this suit was brought to recover their value.   On the part of the defendants evidence was introduced to show that the bonds, together with money and securities belonging to the bank, its officers and other parties, had been stolen from the vault on the 5th of August 1871.   Upon the trial the plaintiff was permitted to prove by Mrs. Trout that "she had a deposit of government bonds in the same bank for safe-keeping ; that she drew the interest and premium on her bonds regularly until the bank closed ; and that, though living just opposite the bank, she never knew or heard of the alleged disappearance."   The object of the offer was stated to be " to rebut the presumption that there ever was any robbery, and to show that the bonds remained in the bank till its close."   The testimony of Mrs. Trout was followed by that of F. S. Dinkle, to the same general effect.   Its admission raises the first question the record presents.

Throughout the trial, the proof had been distinct and clear that the fact of the robbery had never been publicly disclosed.   The officers feared that such a disclosure would injuriously affect the credit of the bank, and the president and cashier undertook, in their individual capacities, to become liable for the principal, interest and premium of the bonds of depositors that had been lost. Notice was given to the Assistant United States Treasurer in New York, and to the Treasury Department at Washington.   The plaintiff was informed of the loss through her brother, residing in

[First National Bank of Carlisle *v.* Graham.]

Monmouth, Ill., some bonds issued by an association there being among her securities, and notice that they had been stolen having been given to that association by the officers of the bank. This, the plaintiff testified, was three or four weeks after the robbery. She called on the cashier, who told her to say nothing and keep quiet; that it was their loss and not hers. She afterwards saw Judge Hepburn, the president, who made the same request that she should say nothing, and gave the same assurance that she should be paid. As to the other depositors, the proof was definite that, whether wisely or unwisely, all publication of the fact of the robbery was sedulously withheld. What, then, was to be gained by the admission of the testimony of these witnesses? It contradicted no facts alleged on behalf of the defence. It was consistent with the statement of the cashier, that he and Judge Hepburn had personally undertaken to pay the interest on the lost bonds. The facts were not only collateral, but they were superfluous for any legitimate purpose of the plaintiff's case. If the failure to make publication had been disputed, and there had been, in the judgment of the court, other affirmative and express evidence before the jury, on the question whether the whole theory of a robbery had been fabricated, it may be that the ruling would have been justified by the salutary principles which enlarge the field of inquiry where it becomes necessary to develop and expose an attempted fraud. There is nothing in this record to exclude the application of the rule that requires the rejection of all collateral facts which are incapable of affording any reasonable presumption or inference as to the principal matter in dispute. And the reason given in the text-books for the existence of the rule seems peculiarly applicable here : " Such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them ; and, moreover, the adverse party having had no notice of such a course of evidence, is not prepared to rebut it :" 1 Greenl. Evid., § 52. The case of Pratt *v.* Richards, 19 P. F. Smith 58, is relied on to sustain the ruling of the court. There, Richards, the lessee of Cooley, had sublet part of the demised premises to Pratt & Co., the defendants. In May 1861, the defendants failed, and asked Richards to cancel the lease. By the evidence offered and rejected in the court below, it was proposed to show that in June or July 1861, Richards had surrendered his entire interest in the premises to the agent of Cooley, the owner, who placed a new tenant in possession of the room the defendants had occupied. The suit was by the assignees of Richards for rent for fifteen months subsequent to May 1851. This court held the evidence to be admissible, and it is difficult to conceive of any principle on which any other conclusion could have been reached. But it is not apparent how that decision can have any bearing as an authority on the question presented here. Nor is the objection of the defendants met by the first suggestion,

[First National Bank of Carlisle *v.* Graham.]

that the evidence of these witnesses was competent because it tended
to establish the fact that notice by advertisement or otherwise was
not given. The question of notice was not in controversy. It
was both proved and admitted by the defendants as part of their
own case, that public announcement of the robbery was purposely
withheld. The evidence was improperly received.

The next question is presented by the series of assignments
which allege error in the instructions given to the jury as to the
measure and extent of the responsibility of the defendants.
Assuming for present purposes on the faith of the verdict, that
the act of the cashier was so far acquiesced in and ratified by the
officers and directors, as to create a contract between the plaintiff
and the bank, it is manifest that the contract amounted at the
utmost to a naked bailment. It was a deposit without compensa-
tion. No undertaking was expressed except that the bonds were
to be returned on the return of the cashier's receipt. The law
regulating such a contract has been settled since the decision of
Coggs *v.* Bernard, 2 Ld. Raym. 909, in the year 1703. "Where
a man takes goods into his custody to keep for the use of the
bailor," it was said by Holt, C. J., in that case, "he is not
answerable if they are stole without any fault in him, neither will
a common neglect make him chargeable, but he must be guilty of
some gross neglect." The principles which govern the relations
between bailors and bailees are succinctly stated in Story on Bail-
ments, sect. 23. "When the bailment is for the sole benefit of
the bailor, the law requires only *slight* diligence on the part of
the bailee, and of course makes him answerable only for *gross*
neglect. When the bailment is for the sole benefit of the bailee,
the law requires *great* diligence on the part of the bailee, and
makes him responsible for *slight* neglect. When the bailment is
reciprocally beneficial to both parties, the law requires *ordinary*
diligence on the part of the bailee, and makes him responsible for
*ordinary* neglect." In Tompkins *v.* Saltmarsh, 14 S. & R. 275,
Duncan, J., in delivering the opinion of the court, said: "Where
one undertakes to perform a gratuitous act, from which he is to
receive no benefit, and the benefit is to accrue solely to the bailor,
the bailee is liable only for gross negligence, *dolo proximus*, a
practice equal to a fraud. It is that omission of care which even
the most inattentive and thoughtless men take of their own con-
cerns. There is this marked difference in cases where ordinary
diligence is required, and where a party is accountable only for
gross neglect. Ordinary neglect is the want of that diligence which
the generality of mankind use in their own concerns, and that
diligence is necessarily required where the contract is reciprocally
beneficial. The bailee without reward is not bound to ordinary
diligence, is not responsible for that care which every attentive and

diligent person takes of his own goods, but only for that care which the most inattentive take."

These principles were applied by Coulter, J., in Lloyd v. The West Branch Bank, 3 Harris 176, and by the present chief justice in Scott v. The National Bank of Chester Valley, 22 P. F. Smith 471, and were recognised by Thompson, C. J., in The Lancaster County Bank v. Smith, 12 P. F. Smith 54. In view of these well-established rules, the presentation to the jury of the legal aspects of this cause was inadequate and imperfect. There was no dispute that this was a gratuitous bailment, and in the general charge the court properly limited the responsibility of the defendant to a case of gross neglect. But this gross neglect was defined to be "the omission of those precautions which persons of common care and common prudence would naturally adopt, though they might, in reference to their own goods, omit them."

In the plaintiff's first point, the court were asked to charge that the defendants were "bound to exercise ordinary care, skill and diligence to keep and return the bonds safely; such care as men of ordinary prudence exercise in the care of their own property." The answer was in these words: "First point affirmed, and for the meaning of gross negligence the jury are referred to the general charge." In the plaintiff's third point, the court was asked to say, that "if the defendants were negligent, and did not exercise ordinary care, skill and caution, to keep the plaintiff's bonds safely, then they are liable for their value, no matter how negligent they may have been in taking care of their own property." The answer was: "Affirmed—see general charge." The defendants had the right to complain of the manner in which the case was submitted to the jury. The standard of duty established for them was one to which they could not, under the evidence, be justly held. In the language of Judge Duncan, in Tompkins v. Saltmarsh, "they were responsible for the omission of care which even the most inattentive and thoughtless men take of their own concerns."

Upon the trial the ground was assumed by the defendants that there could be no recovery against them if the jury should find that they had taken the same care of the plaintiff's bonds that they had taken of their own securities, and complaint is now made of the failure of the court to sustain their position. In a multitude of cases, language has been used by judges which would seem to indicate the existence of the rule for which the defendants contend. Such language was employed in Foster v. The Essex Bank, 17 Mass. 479, and in the cases already referred to, of Coggs v. Bernard, Lloyd v. The West Branch Bank and Scott v. National Bank of Chester Valley. In general, however, this view of the law has been abstractly stated, and where it has been applied, as in Lloyd v. The West Branch Bank, the diligence used by the bailee in the oversight equally of the deposit and his own property, corresponded

with that diligence to which, in the circumstances of the particular bailment, the law held him bound. The authorities relied on by the defendants "do not seem," Judge Story has said, "to express the general rule in its true meaning. The depositary is bound to slight diligence only; and the measure of that diligence is that degree of diligence which persons of less than common prudence, or indeed of any prudence at all, take of their own concerns. The measure, abstractly considered, has no reference to the particular character of an individual, but it looks to the conduct and character of a whole class of persons:" Story on Bailments 564. The fact that the bailee keeps the property of the bailor, with the ordinary care with which he keeps his own, does not fulfil the measure of his legal duty where the contract is one which requires strict diligence and extraordinary care. So, under a contract of bailment, in which the benefits are reciprocal, the bailee is not shielded from liability for neglect of ordinary care by proving that he has been careless, inattentive and reckless in the management of his goods as well as those of the bailor. Cases for the application of the maxim of the Emperor Constantine, quoted in Jones on Bailments 83, "*Aliena negotia exacto officio gerunter*," must constantly arise. The terms used in the authorities referred to are employed more by way of illustration than as a statement of the legal rule. That the bailee has dealt with his property and the bailor's in the same way, is a fact which may be always shown as an element in adjusting the standard of duty, and deciding the question of its performance, as well as a test of the bailee's good faith. On the proof of such a fact, a presumption of adequate diligence would ordinarily arise. But the question of the bailee's responsibility must be finally settled by a resort to the settled principle which deduces the measure of his duty in each particular bailment, from a comparison of his conduct with the conduct not of individuals, but of classes of men. The instructions of the court on this subject in the general charge were, that, if the bailee "takes the same care of the goods bailed that he does of his own, that ordinarily repels the presumption of gross negligence. The desire to preserve one's own property from loss from any cause is, as a rule, so universal, that the mind rests with satisfaction on the evidence which shows the same care of the bailed property which the bailee took to save his own, unless it was shown that he was grossly negligent of both, and when this is done he is not excused, but held answerable." It is conceived that these instructions were unobjectionable. Whether the defendants were guilty of such gross negligence as to make them liable, was a question which, like that which was raised as to the fact of robbery, and like the other issues involved, it was for the jury, under all the evidence, exclusively to decide.

Another error is alleged to have consisted in the answer by the

court to the plaintiff's seventh point, relating to the failure of the bank to give notice of the robbery, and in the direction given to the jury on the same subject in the general charge. The discussion of the point undoubtedly was unduly amplified. The limitation of the plaintiff's right to a verdict only in the event that gross negligence should be made out, was neither expressed nor implied. The instruction, in substance, was, that she could recover if injury resulted to her from the failure of the defendants to give her notice, and that she could recover for such injury, if found, even though the presumption of negligence arising from the want of notice was repelled by proof. The effect of such a direction could only be to leave the precise question on which the jury were to pass in obscurity and doubt. The plaintiff in her testimony stated that she received intelligence of the loss through her brother in Monmouth three or four weeks after it occurred. Charles H. Hepburn thought the interval between the loss and the conversation he had with the plaintiff in regard to it was only eight or ten days. From the time she received notice, if upon a fair representation of their views and motives, she acquiesced in the policy of silence which the officers of the bank had adopted, it would be unjust to permit her to set up the subsequent maintenance of that policy as a ground for the imputation of gross negligence against the defendants. But the fact that no announcement was made in the interval, whatever it was, before the plaintiff was informed of the loss, was fairly a subject for the consideration of a jury. It was for them to weigh it in connection with the other evidence, in deciding the material issues in the cause. Its relevancy and value are shown by the significance that was attached to the proof of the conduct of a bailee contemporaneously with and immediately after a loss of property, in Tompkins *v.* Saltmarsh, *supra*. "I am of opinion likewise," Judge Duncan said, "that evidence ought to have been received of the hue and cry immediately after the discovery—his assiduous and indefatigable pursuit, and strict search, both at the inn and the steamboat. If he had made no complaint or inquiry, remained with his arms folded and his mouth shut, this would have afforded strong evidence of his delinquency; and though it has been said this would have been the course of a guilty man, yet it is one which an innocent man would naturally take, and which, if he did not take, all would condemn him. Nothing would more strongly prove his neglect than this silence, this indifference; the jury would have drawn the most unfavorable conclusions from it." Every case must stand, of course, on its special facts. It may well be that the reasons for the action of the officers of the bank would be satisfactory to a jury, but the necessity is inevitable of submitting the question to them, whether that action involved gross neglect.

The remaining question arises out of the answer of the court to

[First National Bank of Carlisle *v.* Graham.]

the second point of the defendants.    The mere voluntary act of the cashier in receiving the plaintiff's securities would not subject the bank to liability.    But if the deposit was known to the directors, and' they acquiesced in its retention, a contract relation was created, by which the defendants should be held bound.    The question arose in Foster *v.* The Essex Bank, 17 Mass. 479.    That was an action to recover the value of a special deposit.    The bank had no express power by charter to receive deposits of any kind, but the verdict found that the practice had been to receive them always; and Parker, C. J., said : " As the bank from the time of its incorporation has received money and other valuable things in this way, and as the practice was known to the directors, and we think must be presumed to have been known to the company, as far as a corporation can be affected with knowledge; and as the buildings and vaults of the company were allowed to be used for this purpose, and their officers employed in receiving into custody the things deposited, the corporation must be considered the depositary, and not the cashier or other officer through whose agency commodities may have been received into the bank.    The rule thus stated has been uniformly applied by this court in cases involving the rights and duties of the national banks.    The principle announced in the recent New York and Vermont cases of The First National Bank of Lyons *v.* The Ocean National Bank, and Wiley *v.* The First National Bank of Brattleboro', has never been adopted here, so far as it is in conflict with the rule.    If the question here had grown out of an act prohibited by law, the principle of these recent authorities would be applicable, as it was applied in Fowler *v.* Scully, 22 P. F. Smith 456.    But the question arises out of an act which has been neither directly nor impliedly forbidden by statute.    The answer of the court was accurate, and the complaint alleged against it in the supplemental assignment of error is unfounded.

Judgment reversed, and a *venire facias de novo* awarded.