[No. 30531.   Department One.   October 7, 1948.]

PAUL WHITE *et al., Respondents,* v. STEPHEN P.
BURKE *et al., Appellants.*[1]

[1]Reported in 197 P. (2d) 1008.

*Halverson & Applegate,* for appellants.

*J. P. Tonkoff* (of *Tonkoff & Holst*), for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment for plaintiffs in the amount of $3,770, with interest at six per cent, upon an award of a jury for the loss of money deposited by plaintiffs in defendant's hotel.

Defendants have operated the Donnelly hotel in the city of Yakima for fourteen years. In one corner of the lobby of the hotel is a counter, back of which are stationed the clerk and telephone operator. At the rear of the clerk's quarters is a door leading to the manager's office. Just back of this door, and under a stairway, is a large safe, containing compartments used for the keeping of money, bonds, and papers belonging to the hotel and for the safekeeping of money and other valuables of guests and friends of the hotel. The outer door of the safe is closed, but seldom locked by the combination. The inner compartment is locked by a key which hangs on a hook in the clerk's office.

Plaintiffs operate a real-estate office in Yakima and also serve as tax accountants. They live in the Wenas district, about eighteen or nineteen miles from town. During the winter months, when the weather was inclement, and especially during the tax season, January and February, they were guests of the hotel. Almost daily, Mrs. White was a patron of the coffee shop operated by defendants in conjunction with the hotel. On different occasions, plaintiffs sent guests to the hotel. At various times, Mrs. White had deposited money in the hotel safe. Mr. Burke testified: "We showed her the courtesies that are extended to patrons and to other people we had transacted business with." He also testified on cross-examination:

"Q. Now, you stated on direct examination that the Whites had on some occasions sent people to your hotel?

A. That's right. Q. Have you ever requested the Whites to do that sort of work for you? A. No. It was appreciated by us their going out of their way to bring business to the hotel. Q. Did you request them to do that, however, at any time? A. No. Q. You stated, as I recall, that you kept other money in this safe where the White money was? A. Yes. Q. And that was money of the barber shop — A. Well, it was money of the barber shop, the mixer shop and other guests of the hotel and other business people and then we have had money—envelopes in there and bonds and some of our own and our coffee shop and some money has been in there three or four years. Q. In other words, the safe that was used there was used for your coffee shop money and for other moneys that were left there with you at the hotel? A. That's right";

and again on redirect:

"MR. TONKOFF: Q. Mr. Burke, you say at no time had you ever requested Mrs. White to send you any guests at the hotel, is that right? A. That's right. Q. Lots of times you can accomplish that without request and as a matter of courtesy? A. Well, we transacted business during the war with the Whites when eggs were hard to get and they brought eggs in to us and we also went out to their ranch and purchased eggs on different occasions, and so I would say in place of soliciting their business it was a sort of mutual — Q. Affair? A. — mutual affair that we could send people that were interested in the tax being made out, and during that time there was a sort of boom at Hanford and there was people that wanted tax made out, and it was a sort of reciprocation that people that wanted to make out their tax we would send these people to them. It was a sort of solicitation that was mutual without solicitation on either one's part."

On the afternoon of May 5, 1947, Mrs. White withdrew $3,200 from the bank. To this she added $570, intending to give the money to her mother for the purpose of assisting her in buying a home. She walked from the bank to the hotel, received from the clerk a safety-deposit envelope, in which she placed the $3,770, and which was then locked in the safe. The safety-deposit envelope was the kind used by the hotel for customers who leave valuables for safe-keeping. To it are attached two checks, check A and check

B. The depositor signs his name on check A; also, the clerk who receives the package signs his name on check A, and dates it. Check B is torn off and given to the depositor as his receipt. When the depositor calls for his package, he signs his receipt; the signature is compared with the original signature on check A, and the package delivered.

On May 17, 1947, Mrs. White went to the clerk in charge, signed her receipt, and asked for the package. Upon investigation, it was discovered that the package was not in the safe. The clerk called Mr. and Mrs. Burke, who, in turn, called the police, and a thorough investigation was made. The package has never been recovered.

After the verdict of the jury, the defendants moved for a judgment n.o.v. or, in the alternative, for a new trial, which motion was denied.

Appellants assign error in refusing to sustain their position that they were gratuitous bailees as a matter of law; in refusing to grant a motion for dismissal at the close of the plaintiffs' case; in denying the motion for judgment n.o.v. or, in the alternative, for a new trial; in entering judgment for plaintiffs; and in the giving of certain instructions.

■■■ In *Simmons v. Cowlitz County*, 12 Wn. (2d) 84, 120 P. (2d) 479, in discussing the granting of respondents' motion for judgment notwithstanding the verdict, we said:

"We have uniformly held that a motion for judgment notwithstanding the verdict should not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from the evidence to justify the verdict.

"All competent evidence in the record which is favorable to the appellants we must regard as true and must give to them the benefit of every favorable inference which may reasonably be drawn from such evidence. Where the minds of reasonable men may differ, the question should be submitted to the jury. If, when so considered, we find there is substantial evidence to sustain the verdict, the judgment thereon must be affirmed. *Boyd v. Cole*, 189 Wash. 81, 63 P. (2d) 931; *Perren v. Press*, 196 Wash. 14, 81 P. (2d) 867."

Here, there was substantial evidence to submit to the jury the question of the nature of the bailment. The trial court did not commit error in refusing to grant the motion for judgment n.o.v.

Instruction No. 6 was as follows:

"You are instructed that a gratuitous bailment, or one for the sole benefit of the bailor, results when the care and custody of the bailor's property is accepted by the bailee without charge and without any expectation of receiving a benefit or consideration, directly or indirectly, for so doing.

"You are further instructed that in the case of a gratuitous bailment, the bailee is liable to the bailor for the loss, if any, of the bailed property, only in the event that such loss is proximately caused by the gross negligence of the bailee.

"In this connection you are instructed that gross negligence is the failure to exercise slight care or diligence. Whether or not a gratuitous bailee has been guilty of gross negligence, in case of loss of the thing bailed, is always to be ascertained from all the circumstances surrounding the particular bailment in question."

Instruction No. 7 was as follows:

"You are instructed that a person becomes a bailee for hire, and the bailment is thus one for the mutual benefit of the bailor and bailee, when he takes property into his care and custody for a consideration. In such a case the nature and amount of the consideration are immaterial; and it is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the bailee.

"You are further instructed that if a bailment is made at the instance or upon the invitation of the bailee, because of benefits, direct or contingent, which he expects to accrue in his favor, then it is a bailment for hire, or, as it is sometimes called, a bailment for mutual benefit.

"You are further instructed that in the case of a bailment for hire or for mutual benefit, the bailee is under a duty to exercise ordinary care for the protection of the bailed property; and would be liable to the bailor for its loss, if any, if such loss proximately resulted from the failure of the bailee to exercise ordinary care in his custody of the property."

There is no question but that a bailment existed in this case. Possession of respondents' money was transferred to appellants to be later returned to respondents. The principal question is whether the transaction constituted a gratuitous bailment (or one for the sole benefit of the bailor), or a bailment for hire (or for the mutual benefit of the bailor and bailee).

In *Prince v. Alabama State Fair*, 106 Ala. 340, 17 So. 449, 28 L. R. A. 716, a picture was sent to the Alabama state fair for the purpose of having it exhibited and later returned to the sender. It was lost, and, in an action to recover its value, the court said:

"The insistence of the counsel of the defendant is, that though there was a bailment of the painting, the bailment was of the class known as naked, gratuitous deposits, accepted as matter of mere favor or courtesy, from which the defendant was not entitled to benefit, or to recompense for any duty the bailment may have involved. If this be the true character of the transaction, the conclusion follows, which is deduced, that the defendant owed to the plaintiff the duty of slight care only, in the keeping, preservation and restoration of the painting, and is answerable only for gross negligence, or bad faith, to which the loss of the painting is directly traceable.—2 Kent, 560; Story on Bailments, § 62; Schouler on Bailments, § 14. But if the bailment was made at the instance, or on the invitation of the defendant, because of benefits, direct or contingent, it was expected would accrue; or on a contract, express or implied, having a legal consideration, it was not gratuitous. More properly it may be termed lucrative, and the duty of the defendant was the exercise of ordinary care in the keeping, preservation and restoration of the painting, and for ordinary neglect in the performance of the duty the defendant is answerable.—2 Kent, 565; *Moore v. Mayor*, 1 Stew. 284; *Seals v. Edmondson*, 71 Ala. 509.

"The transaction has in it the essential elements and characteristics of a lucrative, as distinguished from a mere gratuitous, bailment; a bailment for the sole benefit of the bailor. It originated in the general proposal of the defendant to all persons having articles deemed worthy of exhibition, to intrust them to the defendant for that purpose, promising redelivery when the exhibition was closed. The proposal, though general in its terms, became a special

contract with each person sending articles for exhibition, when the articles were received and accepted by the defendant.—*Vigo Agricultural Society v. Brumfiel*, 102 Ind. 146; s. c. 52 Am. Rep. 657; 1 Whart. Con., § 24; Pollock Principles of Contracts, 174. The contract was supported by a legal consideration—the detriment and inconvenience to which the sender was subjected at the instance of the defendant, in the transmission of the article, and the benefit, though indirect and contingent, which the defendant contemplated would accrue from the exhibition. . . . In determining whether a bailment is gratuitous or lucrative—a bailment without compensation or benefit to the bailee, or from which he is to derive benefit or profit—the inquiry is not directed to the character or certainty of the benefit or profit; it is whether the bailment was accepted for the purpose of deriving the one or the other.—Schouler on Bailments, §§ 9, 29, 90. Upon this point, the observations of *Bigelow*, J., in *Newhall v. Paige*, 10 Gray 366, are instructive: 'A person becomes a bailee for hire, when he takes property into his care and custody for a compensation; the nature and amount of the compensation are immaterial. The law will not inquire into its sufficiency, or the certainty of its being realized by the bailee. The real question is, was the contract made for a consideration? If so, then it was a *locatum* and not a *depositum*, and the defendant was liable for the want of ordinary care. The general rule as to the consideration of a contract is well understood, and is the same in case of bailments as in all other contracts. The law does not undertake to determine the adequacy of a consideration. That is left to the parties, who are the sole judges of the benefits or advantages to be derived from their contracts. It is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the party making the promise. Where such a consideration exists, a contract cannot be said to be a *nudum pactum*, nor a bailment, a gratuitous undertaking.'

"With the growth and expansion of commerce, of trade, of industrial pursuits, multiplying every species of contracts, drawing all classes into more frequent and varied intercourse, bailments multiply, and it is sometimes a matter, not free from difficulty, to determine to what class a particular transaction may belong, or, when that is ascertained, the measure of duty the bailee assumes. It is not too much to say, that each transaction depends largely upon

its own facts and circumstances, and the existing relations, if any, the parties may bear to each other."

In *Woodruff v. Painter & Eldridge,* 150 Pa. 91, 24 Atl. 621, 30 Am. St. 786, 16 L. R. A. 451, a customer, while trying on a suit of clothes, left a watch and chain in a drawer, upon the suggestion of the clerk. When the customer was ready to leave, it was discovered that the watch and chain were missing. This transaction was held to be a bailment for hire. However, in discussing *Newhall v. Paige,* 10 Gray 366, mentioned in *Prince v. Alabama State Fair, supra,* the court said:

"This, however, would seem to be pushing the principle to a dangerous extreme; it would render it unsafe for any business man to allow another's property to be left about his premises; and would be in seeming conflict with our own cases of *First National Bank of Carlisle v. Graham,* 79 Pa. 106, and *De Haven v. Kensington National Bank,* 81 Pa. 95. The safer rule is to hold a bailment to be for hire, when no hire is paid, in such cases only as it is a necessary incident of a business in which the bailee makes profit; and such the jury might have found the present case to have been."

*Citizens' National Bank v. Ratcliff & Lanier,* 253 S.W. (Texas) 253, was an action for the return of liberty bonds placed with the bank for collection and lost while being mailed to a correspondent bank. In holding this to be a bailment for hire, the court said:

"In order to constitute one a bailee for hire, it is not necessary that the benefits should be large, certain, or of any particular nature. As already quoted from Ruling Case Law, 'the nature and amount of the compensation are immaterial, as the law will not inquire into its sufficiency, or the certainty of its being realized by the bailee.' Again, from the same author, 'it is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the party making the promise.'

"As heretofore quoted from Ruling Case Law, in determining whether a bailment is gratuitous or lucrative, 'the inquiry is not directed to the character or certainty of the benefit or profit, but whether the bailment was accepted for the purpose of deriving one or the other.'

"Under the rules laid down in the last three quotations from Ruling Case Law, we believe there is no doubt but

that the bank, in the instant case was a bailee for hire. Its sale of the bonds was incident to its own business. It had been doing this for its various customers for some time. It was to obtain a direct benefit in the deposit of the proceeds of the sale, and it doubtless thought that its business, generally speaking, would profit in other ways by pleasing and retaining its customers through these courtesies. In other words, it undertook the sale of these bonds with a view of deriving 'benefit and profit' from such act."

In *Warren v. Geater*, 206 Ark. 518, 176 S.W. (2d) 242, a lady had taken an automobile to a service station to· have the heater installed. Such work was not performed at the station, but the operator told her that he would have it done for her. While an employee of the service station was driving the car to a garage to have the work done, it was damaged in a wreck. This transaction was held to be a bailment for hire. The court said:

"The bailment in this case was not one for the sole benefit of the bailor, without compensation or benefit to the bailee. The practice of appellee in looking after this repair work for Miss Warren was not in the nature of a gratuity but it was done as a part of the service appellee was rendering to his customers, which was an inducement to his customers to continue to purchase gasoline and oil from him. A service station operator renders many services to automobile owners for which he makes no specific charge, such as wiping windshields, filling radiators and inflating tires, but these services are not entirely gratuitous. The cost thereof to the station owner is taken into consideration by him when he fixes the prices of gasoline, oil and other commodities that he sells and actually collects for from his customers."

*Bissell v. Harris & Co.*, 95 N.W. (Neb.) 779, arose out of a situation in a small town which had no bank. The farmers wanted cash for grain deposited at the elevator and threatened to take their grain to other places. Plaintiffs (operators of the elevator) arranged to deposit cash, from time to time, with defendants at their store, to be used for cashing checks drawn by plaintiffs in payment for grain purchased from the farmers, thus benefiting both the grain dealers and the businessmen. Some of this money deposited by

plaintiffs was stolen. In holding that the bailment was gratuitous, the court said:

"The first question raised is as to the nature of the transaction—whether it is to be considered a bailment for the benefit of the bailor only, or one for the benefit of both parties. It is clear that the chief object of the bailment was custody of the money, and that the service in paying it out was merely accessory thereto. If plaintiffs had had a safe in their elevator, their agent could readily have performed that service. The object was to put the moneys needed for buying grain in a safe place. Hence, if the defendants were to act without reward, the bailment would be a depositum (Story on Bailments, § 140), and the bailees would be liable for loss only in case of gross negligence. *Burk v. Dempster*, 34 Neb. 426, 51 N.W. 976. Plaintiffs contend, however, that the bailment was for the benefit of both parties, and is to be construed a bailment for hire, because one of the motives, if not the chief motive, of defendants in undertaking to act gratuitously, was the expectation that so doing would assist to hold trade in the town. We do not think this alters the case. This was not a reward moving from plaintiffs to defendants, nor did defendants solicit the bailment in expectation of any such advantage. Plaintiffs' local agent and their treasurer both testify that complaints and dissatisfaction among the farmers were the primary cause of the arrangement, and that defendants, to preserve the business interests of the town, were willing to undertake the service. The substantial benefits all accrued to plaintiffs. Their business, as they admit, was greatly increased, and they were saved the expense of a safe at their elevator, while defendants only shared, with all the other business men in general, incidental benefits of increased trade in the town. The substantial benefits were on one side. No one acts without motive. The motive may be a pure spirit of accommodation. But the law does not require such complete self-denial to make a depositum. The bailment does not become one for hire merely because the motive inducing the bailee to act gratuitously may be an expectation of incidental advantage from such course. *Comp v. Carlisle Deposit Bank*, 94 Pa. 409; *First National Bank of Carlisle v. Graham*, 79 Pa. 106, 21 Am. Rep. 49. For such reasons we think the court below erred in instructing the jury that the defendants would be liable for negligence and in not limiting their liability to loss through gross negligence."

■ To constitute a bailment for mutual benefit, therefore, it is not necessary that the bailee receive compensation in cash. If he derives a benefit to himself by taking possession of the bailor's property, that in itself constitutes sufficient consideration. It is not sufficient, however, that the act be in appreciation of past favors, nor is it sufficient if done solely in anticipation of future favors. But if it is presently done, as an incident to his business and to obtain a benefit to himself, the transaction is for the mutual benefit of the parties.

■ It will thus be seen that the issue as to whether the transaction in question was a gratuitous bailment, or a bailment for mutual benefit, was a question of fact to be submitted to the jury under proper instructions. We cannot say as a matter of law that this was merely a gratuitous bailment. There was sufficient testimony to submit this issue to the jury. That issue was determined in favor of respondents.

■■ Appellants complain that the instructions quoted are too broad. While we feel that there is some merit in this contention, any error which could be predicated thereon has been waived by the appellants, by their failure to propose instructions which might have been more complete and specific. The instructions given properly stated the law, and this court has consistently held that error cannot be assigned on the ground that the instructions should have been more specific, unless the appellant has proposed instructions which were refused. A mere exception to an instruction will not preserve error on appeal because of nondirection. There is no greater duty upon the court than upon the appellants. *Zolawenski v. Aberdeen*, 72 Wash. 95, 129 Pac. 1090; *Lipsett v. Dettering*, 94 Wash. 629, 162 Pac. 1007; *Ziomko v. Puget Sound Electric R.*, 112 Wash. 426, 192 Pac. 1009; *McCreedy v. Fournier*, 113 Wash. 351, 194 Pac. 398; *Wills v. Armond*, 115 Wash. 73, 196 Pac. 649; *Anselmo v. Morsing*, 166 Wash. 111, 6 P. (2d) 377, 9 P. (2d) 100. They contended throughout the trial that this was not a bailment for mutual benefit, that the bailment was merely gratuitous; and they proposed no instructions

on the former theory. The burden was upon them to propose instructions covering all questions submitted to the jury. Not having sustained this burden, the complaint they make will not be heard.

We find no prejudicial errors appearing in the trial. The judgment is affirmed.

MALLERY, C. J., MILLARD, and SIMPSON, JJ., concur.

HILL, J. (concurring)—While I concur in the result in this case, I cannot agree with the majority that, in the matter of instructions, there is no greater duty upon the court than upon the litigants. If the parties submit no proposed instructions, the duty is still upon the judge to "declare the law." Constitution of Washington, Art. IV, § 16.

While a careful preparation of proposed instructions by counsel is prudential, it should not be a requisite for adequate and proper instructions to a jury. It is the duty of counsel not satisfied with the instructions to point out with clarity and certainty wherein an instruction given is erroneous, or why additional instructions are necessary; but it should not be necessary for him to implement, by a proposed instruction, his exception to an instruction given or omitted. Trial judges are often greatly assisted by the submission of proposed instructions, but, when the majority says that the "burden" was upon the litigants "to propose instructions covering all questions submitted to the jury," it is attempting to place the "burden" in the wrong place. It is the duty and constitutional responsibility of the judge to "declare the law."