484 A.2d 744

**FERRICK EXCAVATING AND GRADING COMPANY, Appellee,**

v.

**SENGER TRUCKING COMPANY, a partnership, and Wilbur A. Senger and Marcarious J. Senger, Jr., partners and individually, Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 1984.

Decided Nov. 20, 1984.

182

William G. Sesler, Sesler & Belott, Erie, for appellants.
William C. Sennett, Ronald W. Folino, Erie, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Ferrick Excavating (hereinafter Ferrick) brought this action against Senger Trucking (hereinafter Senger) to recover for damage done to its 1974 Fiat-Allis Chalmers High Lift, while it was being transported on a truck owned and operated by Senger. A jury sitting in the Court of Common Pleas of Erie County returned a verdict for Ferrick in the amount of $30,500. Senger's post trial motion for a new trial was granted by the court en banc on the grounds that the verdict slip was irreconcilably inconsistent and that the court erred in not charging the jury on the law of gratuitous and mutual benefit bailment, but only on the law of ordinary negligence. Superior Court reversed the grant of a new trial, but ordered a remittitur of 20% of the verdict, holding as a matter of law that no bailment was created in this case, and therefore no instruction on bailment was required; and also that a verdict will be molded when the jury's intent is clear, as it was, according to Superior Court, in this case, but there was some confusion in the jury's filling out of forms.

This case arose when Ferrick called Senger to request that Senger assist Ferrick in moving its high loader from one part of Erie to another. Ferrick's truck, normally used for this purpose, was out of service at the time. Senger agreed to move the high loader for Ferrick, and sent its truck, operated by Senger's son, to the site where the high loader was located. Ferrick's employee drove the high loader onto the truck and both Ferrick and the younger Senger secured the high loader to the trailer of the truck. Ferrick's foreman then sent Ferrick's truck driver with young Senger to show him where the high loader should be delivered. Testimony conflicted as to whether Ferrick's driver, riding in the cab with Senger, gave Senger directions on how to go: Senger testified that Ferrick's man told him

to drive down State Street in Erie; Ferrick's employee testified that he did not give these directions, but told Senger to go by way of another route which would have avoided State Street. Senger went down State Street, and while passing under a railroad bridge which crossed overhead, damaged the high loader, which was slightly too high to clear the bridge.

The issues in the case are whether it was error not to have instructed the jury on the law of bailments and the degrees of care which are applicable to the various types of bailments, and whether it was error to order a remittitur.

Concerning the remittitur, the jury received special interrogatories, which they answered as follows:

*Question No. 1:* Do you find that the defendant, Senger Trucking Company, was negligent:

    Yes  X     No    

*Question No. 2:* If your answer to Question No. 1 was "Yes", was such negligence a proximate cause in bringing about Ferrick Excavating and Grading's damages?

    Yes  X     No    

*Question No. 3:* Was the plaintiff, Ferrick Excavating and Grading, contributorily negligent?

    Yes  X     No    

*Question No. 4:* If your answer to Question No. 3 was "Yes", was Ferrick Excavating and Grading's contributory negligence a proximate cause in bringing about Ferrick Excavating and Grading's damages:

    Yes        No  x 

*Question No. 5:* Taking the combined negligence that was a proximate cause in bringing about Ferrick Excavating and Grading's damages as 100%, what percentage of that negligence was attributable to the defendant, Senger Trucking Company, and what percentage was attributable to the plaintiff, Ferrick Excavating and Grading:

Percentage of negligence attributable to defendant, Senger Trucking Company ........ 80%

Percentage of negligence attributable to plaintiff Ferrick Excavating and Grading ....... 20%

TOTAL....100%

If you have found plaintiff, Ferrick Excavating and Grading's, negligence to be greater than 50% do not answer Question No. 6.

*Question No. 6:* State the amount of damages, if any sustained by plaintiff, Ferrick Excavating and Grading, as a result of the accident without regard to and without reduction by the percentage of negligence, if any, that you have attributed to the plaintiff, Ferrick Excavating and Grading.

$30,500

This verdict establishes that Senger was negligent and that his negligence was a proximate cause of the accident, and also that Ferrick was contributorily negligent, but that his contributory negligence was not a proximate cause of the injury. The inconsistency in this verdict is that if Ferrick's contributory negligence was not a proximate cause of the accident, Senger should be liable for 100% of the damages, not 80%, as the verdict slip indicates in the answer to question 5. Ferrick cannot simultaneously escape liability for his 20% contributory negligence because it was not proximately related to the injury and also be liable for that same contributory negligence.

After stating the general principles of law that irreconcilable inconsistencies are not permissible in jury verdicts, that consistency will be presumed if possible, *Beyrand v. Kelly*, 434 Pa. 326, 329, 253 A.2d 269 (1969), and that a trial court must mold the verdict of a jury when that is possible rather than ordering a new trial, *Palmer v. Moses*, 458 Pa. 535, 327 A.2d 80 (1974), Superior Court concluded that the verdict in the present case should have been molded because "the jury clearly intended to express the belief that

Ferrick Excavating was contributorily negligent and responsible for 20% of the total damages of $30,500."

We disagree that the jury's intent was clear. Superior Court accepts Ferrick's argument that the jury made its basic findings of negligence, contributory negligence and proximate cause in the first three questions, which establish that Senger was negligent, its negligence was a proximate cause of the accident, and that Ferrick was contributorily negligent. Ferrick would have it that all questions of negligence and causation are settled as of the answer to question 3. There is, of course, no reason why this should be so. Questions 4 and 5 do exist, and unless they are to be regarded as mere surplusage, they set up an irreconcilable inconsistency between the finding in 4 that Ferrick's negligence was not a proximate cause of the injury and the finding in 5 that Ferrick's proximate negligence was 20%. This type of inconsistency, which is not uncommon, demonstrates what some would see as the impracticability of interrogatories to the jury.

■ Nevertheless, were the remittitur question dispositive of the case, we would agree with the result, i.e., the ordering of a remittitur. Although the verdict is irreconcilably inconsistent, since it simultaneously requires Senger to pay both 100% and 80% of the damages, and although such inconsistency would normally require a new trial, where the party injured by this inconsistency, the plaintiff, is willing to take the lesser of the two sums, the court may properly order a remittitur. This is so because the verdict conclusively establishes both Senger's negligence and the causal nature of that negligence. Only the proximate causation of Ferrick's contributory negligence is at issue. If, therefore, a remittitur were to be ordered based upon Ferrick's agreement to accept the lesser of the two possible verdicts, Senger would not be injured, and would in fact benefit from paying the lesser of the two verdicts. Since Ferrick did agree to a remittitur in the amount of 20% of the award, the case was properly resolved as to this issue by ordering the remittitur. *See Osterling v. Carpenter*, 230 Pa. 153, 79 A.

405 (1911) (remittitur ordered so long as remittee agrees to the reduced amount; otherwise a *venire facias de novo* awarded).  The remittitur, therefore, was proper, but not for the reason given by Superior Court.

Concerning the bailment, as stated above, there was conflicting evidence on the question of whether Ferrick's employee directed Senger's driver to proceed by way of State Street or whether he directed him to go by way of another route.  There was also evidence that the parties had hauled equipment for each other on prior occasions. Senger argues that he was a gratuitous bailee and as such may be held to only a slight degree of care for the property which was bailed.  Ferrick argues that there was evidence contrary to the gratuitous bailment theory and that it was within the court's discretion as to whether the issue should have been submitted to the jury.  Secondly, Ferrick contends that even if Senger were a gratuitous bailee, its duty of care is that of ordinary care, on which the court instructed the jury, and that no error was committed.

The law of bailments is well established, both as to the general nature of bailments and as to the duty of care owed in different types of bailment.  As early as 1875 this Court stated that as to gratuitous bailments:

[t]he law ... has been settled since the decision of *Coggs v. Bernard,* 2 Ld.Raym. 909, in the year 1703.  "Where a man takes goods into his custody to keep for the use of the bailor," it was said by Holdt, C.J., in that case, "he is not answerable if they are stole without any fault in him, neither will a common neglect make him chargeable, but he must be guilty of some gross neglect."  The principles which govern the relations between bailors and bailees are succinctly stated in Story on Bailments, sect. 23. "When the bailment is for the sole benefit of the bailor, the law requires only *slight* diligence on the part of the bailee, and of course makes him answerable only for *gross* neglect.  When the bailment is for the sole benefit of the bailee, the law requires *great* diligence on the part of the bailee, and makes him responsible for *slight* ne-

glect. When the bailment is reciprocally beneficial to both parties, the law requires *ordinary* diligence on the part of the bailee, and makes him responsible for *ordinary* neglect." In *Thompkins v. Saltmarsh*, 14 S. & R. 275, Duncan, J., in delivering the opinion of the court, said: "Where one undertakes to perform a gratuitous act, from which he is to receive no benefit, and the benefit is to accrue solely to the bailor, the bailee is liable only for gross negligence.... It is that omission of care which even the most inattentive and thoughtless men take of their own concerns.... The bailee without reward is not bound to ordinary diligence, is not responsible for that care which every attentive and diligent person takes of his own goods, but only for that care which the most inattentive take."

*First National Bank of Carlisle v. Graham*, 79 Pa. 106, 116–117 (1875). Thus, Ferrick's view notwithstanding, the law of Pennsylvania is, and for *at least* 100 years, has been that different types of bailment impose upon the bailee different standards of care. The reason for the existence of these standards of care, we suggest, is that *basic fairness* is repelled by the notion that a bailee who acts for the bailor's benefit, but not his own, should be sued and held to the same standard of care as if he were acting for a fee, when some misfortune befalls the bailed goods.

■ But in this case, Superior Court determined that no bailment existed because the bailor did not relinquish exclusive possession and control of the property bailed. However, as this Court stated in *Smalich et. al. v. Westfall*, "the fact that a bailor shares the use of the thing bailed [in *Smalich*, rides as a passenger in an automobile] with his bailee does not necessarily cause a termination of the bailment and create a new relationship." 440 Pa. 409, 413, 269 A.2d 476, 480 (1970). *See also Rodgers v. Saxton*, 305 Pa. 479, 484, 158 A. 166 (1931) ("There is no rule of law which makes a bailment terminable upon the bailor's sharing with the bailee the use and enjoyment of the subject of the bailment.") Superior Court, therefore, was in error in de-

termining as a matter of law that no bailment existed in the present case, for the bailee's exclusive control is not a necessary element of a bailment, and even if it were, the record does not establish with certainty that such exclusive control was not present.[1]

Whether the jury should be instructed on a given point of law, of course, depends upon the facts and the issues in the case. It is axiomatic that where there is a dispute as to what the relevant facts are, this dispute must be submitted to the jury along with instructions on points of law which, with a view to the evidence in the case, are relevant. In *Smalich v. Westfall,* where one of the issues was whether the relationship between the owner-passenger of an automobile and a driver of the automobile was bailor-bailee, principal-agent, or master-servant, this Court stated:

> [T]he precise nature of the relationship between the owner-passenger and the driver, under the evidence, presents a question of fact which it is the exclusive function of the jury to determine, except where the facts are not in dispute and the evidence is direct and certain, presenting no question of credibility and leaving no sufficient ground for inconsistent inferences of fact. . . .

440 Pa. at 418, 269 A.2d at 483 (1970) (Citation omitted).

In the present case there is a factual dispute as to the precise nature of the relationship between the parties. The evidence is conflicting, for example, on whether Ferrick's employee gave Senger's driver directions to the job site. Similarly, there is disagreement as to whether the bailment, should one be found to exist, was for mutual benefit (because both parties looked to the future when each would be available to help the other), or whether the bailment was gratuitous. These are questions of fact which, as always, a jury must decide when there is a conflict in the evidence.

---

1. Ferrick's employee testified that although he directed Senger to travel by one route, Senger travelled by another. This hardly suggests that Ferrick retained control.

Finally, Ferrick contends that even if there were a gratuitous bailment in this case, there was no error in the trial court's instructions on negligence, for there is only one degree of care in Pennsylvania's law of negligence, that of ordinary care, on which the jury was instructed. In support of this argument, Ferrick cites a number of Superior Court cases, one of which states: "There are no degrees of negligence in Pennsylvania," *West Penn Administration, Inc. v. Union Nat'l Bank of Pittsburgh,* 233 Pa.Super. 311, 332 n. 19, 335 A.2d 725 (1975), and another of which states: "There is only *one* degree of care in the law, and that is the standard of care which may reasonably be required or expected under all the circumstances of a given situation," *Fredericks v. Castora,* 241 Pa.Super. 211, 215, 360 A.2d 696, 698 (1976).

■ As to the first citation, concerning degrees of negligence, we agree that there are no degrees of negligence in Pennsylvania. There are and always have been differing *standards of care,* however, at least in bailment cases, and the assumption that the *Fredericks* case, supra, which did not concern bailments, may be read, because of the generality of its language, to be relevant to the law of bailments, is rejected.

■ The distinction we are making between degrees of negligence and degrees of care is, in fact, recognized by the Harper and James treatise on torts, which observes that the commentators "are well-nigh unanimous in rejecting degrees of care," § 16.13, n. 13, but acknowledges, nevertheless, that there is an exception in the law of bailments:

> According to prevailing modern doctrine [the jury's determination of what precautions were appropriate in the circumstances] does not mean that different degrees of care (or of negligence) are being applied, because the legal standard remains constant—namely, what a reasonably prudent person would do under all the circumstances. And this standard is the one broadly applied throughout the field of negligence.

. It would be possible, however, to use different standards for measuring men's conduct in different types of situations. *To a limited extent this has occurred in some fields of tort law, particularly that of bailments* (i.e., where the bailor seeks to hold the bailee liable for injury to the thing bailed). A rule was formulated by early decisions that where the bailment is for the exclusive benefit of the bailee, he is bound to use great care and is liable for slight negligence; where the bailment is for the mutual benefit of the bailor and bailee, the latter must use ordinary care and is liable for ordinary negligence; where the bailment benefits the bailor only, the bailee need use only slight care and is liable only for gross negligence.

II, THE LAW OF TORTS, 945 (1956 Ed.) § 16.13 (footnotes omitted). (Emphasis supplied). These standards of care, which derive ultimately from the Roman law, *Cody v. Venzie,* 263 Pa. 541, 543, 107 A. 383 (1919), are, as we have seen, the law of Pennsylvania. *First National Bank of Carlisle v. Graham,* supra; *Cody v. Venzie,* supra.

We are not insensible to the argument that the concept of degrees of care suffers from some of the same infirmities as the concept of degrees of negligence, viz., the difficulty of instructing the jury on the precise meaning of these terms and the difficulty of even being able to define the terms ourselves, at least in the abstract. It has been ably argued, for instance, that there is, in fact, no difference between reasonable care and the highest practicable care:

> [B]etween care as great as reasonable prudence requires and care as great as is practicable, no one but a juryman is authorized to say that there is any difference at all. In an Illinois case, it was said that carriers whose employees "have to act in a sudden emergency" are to be judged "by the standard of what a prudent person would have been likely to do under the same circumstances." If in an emergency it is only practicable to take reasonable care, is it not also true that where there is time to deliberate it is only reasonable to take all practicable care? Is it ever

practicable to use more care than one reasonably can; or is it ever reasonable to use less? Would a thoughtful and conscientious man take less care than it was reasonably practicable to take? Is justice or policy satisfied with less? If the answer to these questions is no, then there is no difference between the two modes of instruction [reasonable care and the highest practicable care]....

Green, High Care and Gross Negligence, 23 ILL L.REV. 4, 10 (1928). Another way to make this argument might be to say that where it makes sense to take any care at all, the care that should be taken will depend upon the circumstances (e.g., the risks, the precautions available, the costs of such precautions), and, therefore, there is no such thing as slight care, or ordinary care, or great care in the abstract.

These considerations notwithstanding, we deem it sound policy to maintain the distinction as to standards of care in bailment cases. For one thing, although the terms slight care, ordinary care and great care may be imprecise in the abstract, they nevertheless are workable as practical guidelines for the imposition of liability. We do not believe that a jury, having heard the evidence in a case, will have difficulty in deciding whether the care taken was slight, ordinary or great, and we see no difficulty in the jury's being instructed on the obvious point that they may consider the circumstances of the case in making this determination.

Furthermore, upholding different standards of care with respect to various bailments promotes our main objective: to provide protection for both the gratuitous bailee and the gratuitous bailor, persons who derive no personal benefit from the thing they do at another's request. The common sense of the matter is that a person who holds another's goods as a favor should not be held liable for damage to those goods unless he has behaved in some reckless fashion; and a person who has borrowed another's goods without payment of a fee should be required to take greater care for the preservation of those goods than he would under normal circumstances for his own goods; and

in this area, if in no other, the law should. follow common sense and human experience.[2]

2. Although this Court in *First National Bank of Carlisle v. Graham,* 79 Pa. 106 (1875) cited the case of *Coggs v. Bernard* (1703) as authority for the proposition that there are three degrees of care in bailment cases, we recognize that there is disagreement among legal historians as to whether Judge Holt was restating the Roman law concerning degrees of care in *Coggs v. Bernard,* or whether he was misstating Roman Law. Professor Frederick Green, High Care and Gross Negligence, 22 ILL L.REV. 4 (1928), takes the view that Judge Holt derived his understanding of Roman law from Bracton, writing soon after the year 1250, whose explication of Roman law of degrees of care may have been misinterpreted by Judge Holt, and at any rate, went unnoticed for 400 years until Lord Holt undertook to utilize Bracton as authority in a tort action involving a gratuitous carrier. Holt's "erroneous" views then, according to Professor Green, became enshrined in the law:

> The only persons from whom Lord Holt says that high care is due are borrowers, who whether they pay hire or borrow free, are bound to the utmost care a very careful man would use. And the only persons who, according to him, are liable only for gross negligence are those who accept gratuitous deposits. In accordance with the latter rule, the court of King's Bench agreed, in 1738, that in "case of a simple depositum without reward the law raises only a promise not grossly to neglect or abuse the deposit."

22 ILL L.REV. at 12. The result of Holt's interpretation of Bracton's explication of Roman law, according to Green, is that Holt's theory of degrees of care was adopted by Sir William Jones, in his ESSAY ON BAILMENTS (1781), Kent in his COMMENTARIES (1827) and Story in his treatise BAILMENTS (1832), and all of these authoritative sources, in turn, were erroneously adopted by English and American courts. *Id.* at 14.

Whether this view is or is not correct, however, makes no difference to our analysis, for we are very nearly in agreement with the position of Sir William Jones as it is described by Professor Green:

> [Sir William] concludes that "the plain elements of natural law" agree with the theory which Pothier had propounded of the Roman law, that high care is due from a bailee if the bailment is for his benefit only, slight care if it benefits the bailor only, and ordinary care if it benefits both. For though he admits that "a bailee of common honesty, if he also have common prudence, would not be more negligent than ordinary in keeping the thing bailed," yet he thinks that one who takes charge of goods without reward ought not to be required to trouble himself further than to act in good faith, nor would many be willing to do so; while, on the other hand, one who borrows gratis should assume the burden with the benefit, and few would lend without reward except on condition that the borrower use great care.
>
> Pothier's theory, then believed to be a true exposition of the Roman law, was obviously the source of Sir William Jones's doc-

■ Thus, once it is determined that a bailment exists, the fact finder must then determine what type of bailment it is and which of the appropriate standards of care is applicable to the bailee. If the bailee's care exceeds that required (i.e., slight care, ordinary care, or great care), then there will be no liability in the case. If, on the other hand, the bailee's care is determined to be less than that required, then the fact finder must proceed to determine what proportion of the liability is to be assigned to the defendant(s), and what, if any, to the plaintiff.

■ For the reasons given above, the case is remanded for a new trial. If similar conflicting evidence is again adduced at the re-trial, the jury must be instructed on the law of bailments and be given an opportunity to determine whether a bailment existed. If the determination is that a bailment did exist, the jury must then determine the type of bailment and utilize the applicable standard of care for that type of bailment in determining whether the bailee is liable. If liability is established (i.e., if the bailee's standard of care is less than that required for the particular type of bailment involved), then the jury must apportion liability between the defendant and the plaintiff.

Reversed and remanded for a new trial.

trines; but he regarded them as "axioms ... flowing from natural reason, good morals, and sound policy....
22 ILL L.REV. at 13. We join Sir William in his view that these standards of care are consistent with " 'natural reason, good morals, and sound policy'."