674 A.2d 665

J. Bradley McDERMOTT, James T. McDermott, Jr., and Michael J. McDermott, Executors of the Estate of the Honorable James T. McDermott, Deceased, Appellants,

v.

Daniel R. BIDDLE, Philadelphia Newspapers, Inc., and Knight–Ridder Newspapers, Inc., Appellees.

Supreme Court of Pennsylvania.

Argued Dec. 5, 1995.

Decided April 12, 1996.

22

James E. Beasley, Barbara R. Axelrod, Philadelphia, for McDermotts.

William T. Hangley, Daniel Segal, Albert G. Bixler, John H. Estey, Philadelphia, for Biddle, et al.

Before FLAHERTY, ZAPPALA, CAPPY and CASTILLE, JJ.

*OPINION OF THE COURT*

FLAHERTY, Justice.

This is an appeal from the order of the Superior Court affirming the trial court's award of a new trial in a defamation action brought by a public figure. The new trial was granted due to apparently inconsistent jury verdicts as to two separate but similar publications. The jury found both publications libelous but only one false (hence compensable), and the other

not proven false (hence not compensable). We granted allocatur to consider the propriety of granting a new trial.

Between May 15 and May 17, 1983, the *Philadelphia Inquirer* published a series of three articles entitled "Above the Law" (ATL I) written by Daniel R. Biddle about the Supreme Court of Pennsylvania. The first two articles in the series described several activities allegedly undertaken by the late Mr. Justice James T. McDermott (McDermott), both before and after his installation on the Supreme Court. These activities included improper favoritism to the coal industry, allegedly due to coal industry lobbying and entertainment of McDermott as well as contributions which the law firm representing the coal companies made to McDermott's electoral campaign for the Supreme Court. McDermott was also reported to have improperly favored a party in a real estate case due to the party's relationship to the law firm involved in the coal case which had made campaign contributions to McDermott. Finally, alleging nepotism, the *Inquirer* reported that McDermott had used the prestige of his office to pressure the Philadelphia County District Attorney to hire his son, Jamie McDermott, as an assistant prosecuting attorney. McDermott brought a libel action against appellees, the author and the corporations which published the articles.

Appellees later reprinted the series of articles in 12″ × 14″ tabloid form, altering the text in minor respects and adding an editorial and two cartoons (ATL II). Copies of the tabloid publication were distributed at a February 1984 national conference of the American Bar Association and the American Judicature Society, as well as at journalism schools and newspapers throughout the country. McDermott filed a second libel action on the basis of ATL II. The two actions were consolidated in the trial court and were tried together.

The case was submitted to the jury with separate verdict slips for the two publications requiring independent findings as to the two publications. The jury found that McDermott had not proved that the first publication of the articles in the *Philadelphia Inquirer* was false, and awarded no damages. The jury found, however, that McDermott had proved that the

tabloid reprint was false, awarding $3,000,000 in compensatory and $3,000,000 in punitive damages. Following the trial, McDermott died. His sons, appellants, who were the personal representatives of his estate, succeeded to his interest and were substituted as parties.

On consideration of post-trial motions, the trial court determined that the verdicts were fatally inconsistent and awarded a new trial on both publications. The court also held that the reporting of the coal case and the land use case, which accused McDermott of being influenced by campaign contributions and other perquisites, was not actionable under the holding of *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), because McDermott's state of mind, that is, the actual influence the contributions exerted on his decision-making process, could not be objectively verified or disproved. Appellants appealed the order granting a new trial.

The Superior Court affirmed, holding that the two publications were essentially identical so that the inconsistent verdicts, finding the first publication defamatory but not false and the second publication false as well as defamatory, were impermissible, must be stricken, and require a new trial. We granted allocatur to review the sole issue of whether the jury verdicts in the two cases were so inconsistent as to require a new trial.[1]

Appellants argue that the two publications were separate and distinct, not requiring the same verdicts, and that the jury instructions and verdict slips correctly allowed for different results as to the two publications. Appellants emphasize the differences between the two publications: in ATL II, the original articles were explained, amplified, and exacerbated by the addition of highly critical editorial commentary and the inclusion of two cartoons ridiculing McDermott's court. Appellees, on the other hand, minimize the differences between

1. The Superior Court correctly held that the trial court's treatment of the *Milkovich* nonverifiability issue was not a final decision, and was not appealable. In short, it was dictum. We agree that the issue was interlocutory and nonappealable, and therefore limit our review to the question of inconsistency in the jury verdicts.

the publications, calling them "essentially identical" and arguing that if the first series of articles did not libel McDermott, then it is logically and legally impossible for the reprint to be libelous.

■ Clearly, the two publications were similar but not identical. The question is whether the similarities were so strong, the differences so inconsequential, as to require the same result in both cases. If not, then it was error to vacate the jury verdicts and award a new trial. We hold that it was permissible for the jury to reach different results in the two cases, the verdicts should stand, and no new trial is warranted.

■ We begin with the presumption that jury verdicts are consistent, that is, consistency will be presumed unless there is no reasonable theory to support the jury's verdict. *See Ferrick Excavating and Grading Co. v. Senger Trucking Co.,* 506 Pa. 181, 186, 484 A.2d 744, 746 (1984); *Beyrand v. Kelly,* 434 Pa. 326, 329, 253 A.2d 269, 270 (1969); *Hornak v. Pittsburgh Railways Co.,* 433 Pa. 169, 175, 249 A.2d 312, 315 (1969).

The verdicts reflect the jury's judgment that the two publications differed in a material way so that the second was false though the first was not. This judgment was rejected by the trial court, which granted a new trial, by the Superior Court in affirming, and by appellees in their arguments to this court. The Superior Court stated its rationale as follows:

Although the jury considered allegations of defamation in two separate publications, ATL I and ATL II, the text of the two publications was essentially identical, as the second was largely a reprint of the first. However, ATL II was not only a reprint, but also contained certain additional material. This material consisted of two cartoons, an editorial piece and a brief introduction. None of these materials made any specific mention of Justice McDermott or his conduct. One cartoon depicted the Supreme Court building as bearing the insignia "PA. Supreme Disgrace," with two farcical statues standing in front. The other showed the Supreme Court building with a sewer in front from which is issuing the phrase "OYEZ, OYEZ, OYEZ." The editorial

was entitled "The poisoning of justice affects all Pennsylvanians." Although the editorial was an undoubtedly negative commentary on the Supreme Court and reiterated in general terms the conclusions drawn in ATL I, it contained no new information concerning the court and no specific reference to Justice McDermott and focussed on specific allegations aimed at Justice Larsen.

We agree with the trial court's determination that no reasonable explanation for the disparity in the jury's findings can be found based on these differences in the two publications. The trial court appropriately did not consider whether the jury could have found a separately false defamatory statement concerning Justice McDermott in the cartoons or the editorial, because the McDermotts had never contended that these portions of ATL II were separately false. The court had not submitted these two items to the jury for a determination of truth or falsity and had properly instructed the jury to consider the cartoons and the editorial *only* in connection with determining whether ATL II had defamatory meaning, and *not* in determining the separate question of whether ATL II was false. Therefore, the jury's conflicting verdicts could not be explained on the basis of the falsity of statements in the cartoons or editorials.

*McDermott v. Biddle,* 436 Pa.Super. 94, 116–17, 647 A.2d 514, 525 (1994) (emphasis in original). It follows that the jury might properly have found ATL II defamatory while ATL I was not, but having found both publications defamatory, the jury was precluded from finding ATL I true and ATL II false.

The flaw in this logic is the assumption that the jury's finding that both publications were defamatory means that the jury ascribed the *same* defamatory meaning to both publications. If, however, the jury understood ATL I to communicate one defamatory message and ATL II, enhanced by editorials and cartoons, to communicate a different more egregious or invidious defamatory message, then there is no inconsistency in finding that McDermott proved by clear and convincing evidence that the second publication was false though he failed

to prove by clear and convincing evidence that the first was false.

Appellees argue that the two publications must have had the same defamatory meaning, for McDermott's position throughout the trial was that the publications accused him of actually being improperly influenced by campaign contributions and coal industry perquisites and of actually using his office to obtain a position in the district attorney's office for his son—not merely of acting in such a way as to give the appearance of impropriety. Though this accurately characterizes McDermott's trial strategy, it is impossible to say that the ATL articles had precisely the same meaning in the two publications when the reprinted articles are read through the screen of editorial and cartoon comment. Indeed, in charging the jury as to the defamatory nature of the articles, the court stated:

> In your consideration of these sections [alleged to be libelous], members of the jury, you are not just limited to words and language in those sections, you may also consider the headlines, the introductory paragraphs, the way the paragraphs were put together for publication, the photographs and the captions under the photographs, because they provide the context to the parts of the articles alleged to be libelous of Justice McDermott.

> And with respect to the claim on the re-publication, you may also consider those sections that I just referred to and, in addition, you may consider the cartoons and the editorials that are part of P–3.

It is thus impossible to say that the jury, finding both publications to be defamatory, must have found *precisely* the same defamatory meaning in the two publications. And if the defamatory meanings conveyed to the jury by the two publications differed *in any respect,* then there is nothing irreconcilable in its finding that McDermott failed in one instance to prove the publication false though he successfully proved falsity in the other.

In charging the jury on falsity, the trial court stated:

Now, in determining whether the articles published by the defendants concerning Justice McDermott were false, again you should not only consider the individual statements in the articles, but you should consider them as a whole, including the headlines, the introductory paragraphs, the photographs, the captions under the photographs and any innuendos or implications which you find concerning Justice McDermott.

You should also consider the overall message or gist of the articles as they concerned Justice McDermott. You shall then determine whether you find from the evidence that plaintiff has proven by clear and convincing evidence that any of the innuendos and implications he attributes to the articles are false.

. . . .

In order to recover on this second lawsuit, plaintiff must prove each of the four elements of defamation I have just explained to you with regard to the portions of the tabloid . . . reprint at issue. . . .

Thus, you must determine that the reprint was defamatory as to Justice McDermott, and that it was understood to be defamatory by the readers at whom it was intended to be circulated, and that it was published with actual malice, as I have earlier defined it for you.

In considering the defamatory meaning of the articles in tabloid form here you may, in addition to the headline, the photographs, et cetera, you may also consider the cartoons and the editorial in the tabloid.

This emphasized to the jury that in determining truth or falsity, the contextual additions to the publication were to be considered. If the jury *rejected* McDermott's understanding of the first publication, which was that ATL I accused him of actual misconduct, then the jury might very well find that he had failed to establish the falsity of that publication. If the jury then *accepted* McDermott's understanding of the second publication, which was that ATL II accused him of actual misconduct, then the jury might, without inconsistency, find the second publication false, as appellees never rebutted

McDermott's evidence that he was not guilty of misconduct.[2] The contextual surplusage in ATL II, editorial and cartoons, together with the different audience of intended readers, would clearly justify the jury in ascribing different meanings to the two publications so that one might be considered true and the other false.

We therefore hold that it was error to vacate the jury's verdicts due to perceived inconsistency. Only if there is no reasonable theory to support the jury's verdict may the presumption of consistency be overcome. *Beyrand v. Kelly*, 434 Pa. at 329, 253 A.2d at 270.

Order of the Superior Court is reversed and the case is remanded to the trial court for entry of judgment on the jury's verdict.

NIX, C.J., did not participate in the consideration or decision of this case.

CAPPY, J., files a dissenting opinion.

CAPPY, Justice, dissenting.

Because I believe that the majority has misapplied the required standard of review applicable to this case, I am compelled to respectfully dissent.

The majority correctly recounts our standard of review when it concludes that where jury verdicts are challenged as being inconsistent, an appellate court presumes that they are consistent *unless there is no reasonable theory to support the verdicts.* Majority op. at 25 (citing *Ferrick Excavating and Grading Co. v. Senger Trucking Co.*, 506 Pa. 181, 186, 484

---

**2.** This does not imply that appellees had any burden to prove the truth of their publication. The trial of this issue did not run afoul of *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), which held that public figure plaintiffs bear the burden of proving that the claimed defamatory publication is false if the material involves matters of public concern. Here McDermott presented evidence of falsity and appellees did not attempt to rebut his evidence, choosing rather to argue that the publication had a less serious defamatory meaning alleging not actual misconduct but only the appearance of impropriety.

A.2d 744, 746 (1984); *Beyrand v. Kelly,* 434 Pa. 326, 329, 253 A.2d 269, 270 (1969); *Hornak v. Pittsburgh Railways Co.,* 433 Pa. 169, 175, 249 A.2d 312, 315 (1969).) What is reasonable, of course, is always subject to honest debate. Here, however, notwithstanding the fact that the majority adopts the correct standard of review, I believe that the "reasonable theory" utilized to reach its ultimate conclusion in the matter *sub judice* is untenable and implausible.

The majority attempts to harmonize the jury's verdicts by theorizing that the jury *could have found* that the first article ("ATL I") had a defamatory meaning which was, in fact, different and distinct from the defamatory meaning of the second article ("ATL II"). Thus, the question becomes whether this conclusion is a *reasonable* conclusion based on the facts of this case. A thorough search of the record establishes that although two separate complaints stating independent causes of action were filed and later consolidated for trial, neither initial pleading suggests that the two newspaper articles were capable of two separate and distinct defamatory meanings. To the contrary, the complaints at issue claim that both ATL I and ATL II had the *same* defamatory meaning. Furthermore, I can find no indication that any alternate theory of defamation was ever presented in evidence or argued at trial; nor was any alternative theory the subject of the trial court's formal charge to the jury. Thus, to conclude that the lay jury, when deliberating this matter, "could have" come up with an alternative theory of defamation is to conclude that the lay jury possessed significantly more legal talent than any of the professionals involved in the case. Hypothesizing that the jury might have created a new theory of defamation, one on which apparently no evidence was offered and on which the jury was not charged by the court, to me seems to be an eminently *unreasonable* theory, and therefore, violative of our standard of review.

Although I have the most profound and sincere respect for my former colleague, the late Mr. Justice McDermott, and although I carry in my heart a deep felt realization that what was once an unblemished reputation for competence and integ-

rity was unfairly and unnecessarily sullied by careless, unprofessional and vicious reporting, in matters such as these, I am bound by my oath of office and by my conscience to follow the law as I see it. My late friend and colleague would have required nothing less of me.

For reasons stated above, I am constrained to respectfully disagree with my learned colleagues in the majority and conclude, as have the lower courts, that the verdicts subject to this appellate review are legally inconsistent as applied to the facts at hand and thus, Appellees should be awarded a new trial. Accordingly, I respectfully dissent.