## Sweikert v. Kostin

C.P. of Dauphin County, no. 4875 S 1996.

*Richard C. Angino,* for plaintiffs.
*John Kantner,* for defendants.
*Leigh A.J. Ellis,* for additional defendants Keyser and Anesthesia Services.

TURGEON, *J.,* July 18, 2001—On January 25, 2001, a jury rendered a verdict, slightly in excess of $1 million, in favor of plaintiff Margaret Sweikert and her husband Earl Sweikert Jr., finding defendants and additional defendants liable for Mrs. Sweikert's arm injury.[1] On January 26, 2001, plaintiffs filed a motion for post-trial relief seeking a new trial or a judgment n.o.v. and remittitur. On January 31, 2001, additional defendants also filed a post-trial motion seeking a new trial or judgment n.o.v. Oral argument was held April 3, 2001. On May 25, 2001, this court entered an order denying both post-trial motions from which both parties have appealed. This opinion is written in support of that order.

---

1. The verdict was moot as to defendants since they had settled with plaintiffs just prior to trial.

## FACTS

On December 19, 1995, Mrs. Sweikert visited her family doctor with breathing difficulty and chest pain. She was referred to the Harrisburg Hospital emergency room where she was seen by chief surgical resident Dr. William Rhodes, covering for thoracic surgeon Raymond Kostin M.D. Mrs. Sweikert was diagnosed with a spontaneous right pneumothorax, or lung collapse. The lung collapse was caused by a bleb or weakness on the lung surface which allowed air to escape and become trapped in her chest wall, causing pressure and downward collapse of the lung. (N.T. 1/23/01 vol. I 8-9.) Mrs. Sweikert had suffered from the same ailment in 1993 and had been treated then by Dr. Kostin. At that time, her condition had resolved after insertion of a chest tube and removal of the air at its leak. In this case, Dr. Rhodes inserted the chest tube but the bleb failed to seal on its own.

Dr. Kostin recommended Mrs. Sweikert undergo video-assisted thoracoscopic surgery (VATS) for resection of the probable apical bleb and stapling of the area. Mrs. Sweikert agreed and on December 21, 1995, underwent the procedure at Harrisburg Hospital. Dr. Kostin performed the surgery with the assistance of Dr. Rhodes. Dr. Glenn Keyser was the anesthesiologist. VATS requires that three small openings be made in the patient's chest area, including one near the armpit. Various instruments are then placed in and out of the ports as necessary, including a video camera, stapler and grasper, and post-surgically, a chest tube.

Mrs. Sweikert was originally placed supine (flat) and given anesthesia. Upon Dr. Kostin's instruction, she was

moved onto her left side at a 30 degree angle (semi-lateral decubitus position). Dr. Kostin made the ultimate decision about arm positioning and Dr. Keyser physically manipulated Mrs. Sweikert's arm according to his instructions. (N.T. 1/24/01 178.) Dr. Kostin allegedly wanted her arm in the "Statue of Liberty" position. (N.T. 1/24/01 56.) That position was described as one where the arm is angled at 90 degrees from the body and slightly more than 90 degrees at the elbow and placed in an arm board. (N.T. 1/23/01 vol. I 42, 44; 1/24/01 53-54.) This position is similar to the wave position where the elbow is at a 90 degree angle, as if taking an oath or waving. (N.T. 1/24/01 50.) Both positions are typically used in the type of surgery Mrs. Sweikert underwent. (N.T. 1/23/01 vol. I 81; 1/24/01 50, 53, 76; 1/25/01 13-14.) Where a patient is in the semi-decubitus position, there is an association between brachial plexus injuries and the arm being raised to an angle greater than 90 degrees.[2] (N.T. 1/24/01 24, 51; 1/25/01 21.)

Mrs. Sweikert's arm was positioned at about 10:40 a.m. and remained that way until about 12:10 p.m., when surgery concluded. (N.T. 1/24/01 186.) Mrs. Sweikert was admitted to the post-anesthesia care unit recovery room around 12:30 p.m. At approximately 9 p.m., Mrs. Sweikert complained to the nurse of right arm numbness from her elbow to her fingers. She was unable to make a fist, squeeze the nurse's hand or do any fine-finger movement. Dr. Rhodes saw Mrs. Sweikert a short while later

---

2. The brachial plexus is a group of nerves originating in the spine which course through the shoulder down the arm and includes the radial, median and ulnar nerves, among others. (N.T. 1/23/01 vol. I 26-29.)

and recorded that Mrs. Sweikert's chief complaint was right arm numbness/tingling. She complained as well the next morning to Dr. Kostin of tingles in her fingers.

Mrs. Sweikert's condition failed to resolve and she was later diagnosed with a brachial plexus injury to her upper right extremity. As of the trial, Mrs. Sweikert had limited range of motion in her right arm (her dominant arm), had a constant burning sensation, was unable to use her thumb, and her hand and fingers were in a retracted position. Her condition is considered permanent. Plaintiffs alleged defendants Dr. Kostin and Harrisburg Hospital (Pinnacle Health), through the action or inaction of its assisting medical staff, caused a brachial plexus stretch injury during surgery as the result of her surgical positioning. Plaintiffs alleged that because the bleb was located at the extreme top of her lung, Dr. Kostin could not have been able to maneuver the surgical instruments through Mrs. Sweikert's armpit port without raising her arm to an angle greater than 90 degrees. Defendants in turn filed suit against Dr. Keyser of Glamm Anesthesia Services and Anesthesia Associates of Pennsylvania, arguing they were liable for any injury suffered by Mrs. Sweikert.

On January 22, 2001, just prior to trial, defendants Dr. Kostin and Harrisburg Hospital settled with plaintiffs for $125,000. The jury was not informed of the settlement and the defendants, through counsel, participated in the trial.

Plaintiffs' theory of liability was that surgical positioning caused a stretch of the nerves and that additional defendants, through Dr. Keyser, were ultimately responsible for positioning. Additional defendants proposed

other theories of liability including that one of the surgical instruments inserted by Dr. Kostin or Dr. Rhodes caused a brachial plexus contusion or compression, or that the injury was caused by pre or postoperative chest tube insertion or by a pre or postoperative stretch injury. Defendants and additional defendants also suggested that stretch injuries are known to occur during surgery in the absence of negligence. Due to a lack of direct evidence of injury, the jury was instructed on the res ipsa loquitur doctrine. Following trial, the jury returned with a $1,020,338.92 verdict, finding defendant Dr. Kostin 45 percent liable, defendant Harrisburg Hospital 45 percent liable and additional defendants, Dr. Keyser, Glamm Anesthesia Services and Anesthesia Associates of Pennsylvania, a combined 10 percent liable.

### *Additional Defendants' Post-Trial Motion*

Additional defendants sought a new trial arguing the court erred in permitting plaintiffs to directly examine Dr. Kostin regarding medical chart notations made by Dr. Rhodes, the chief resident acting under Dr. Kostin's supervision. (N.T. 1/23/01 vol. I 14-16, 25-26, 30, 32-33, 94, 97.) Dr. Rhodes was unavailable as a witness at the time of trial.[3] Dr. Rhodes, who attended to Mrs. Sweikert after she had complained of an arm injury, recorded the following postop progress notes on December 22, 1995: "Assessment/plan postop 1. Stretching of brachial plexus. No leak. Continue suction today." In addition, on December 26, 1995, Dr. Rhodes documented the following

_____

3. Following his residency, Dr. Rhodes went to Africa as a missionary surgeon. (N.T. 1/23/01 vol. I 73.)

in Mrs. Sweikert's discharge summary: "Postoperatively the patient did well except for some mild parasthesias in her right hand probably secondary to a contusion of the brachial plexus during positioning in the operating room." Additional defendants filed a limine motion January 16, 2001 seeking exclusion of this evidence as hearsay which I denied January 23, 2001. In ruling on this motion, I agreed with the additional defendants that Dr. Rhodes' notes constituted hearsay which did not fall within the business records exception. See Pa.R.E. 803(6) and comment (1998). However, I found the notes within the exception as an admission made by the party opponents, defendants Dr. Kostin and Harrisburg Hospital. Pa.R.E. 803(25). The hearsay exception for party opponent admissions provides as follows:

*"Rule 803. Hearsay exceptions; Availability of declarant immaterial*

"The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness.

"(25) Admission by party-opponent

"The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course

and in furtherance of the conspiracy. The contents of the statement may be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E)."

The applicable exception here was (D) wherein the notes made by Dr. Rhodes, an agent of Dr. Kostin and Harrisburg Hospital, constituted "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." As set forth recently by the Superior Court, the elements necessary to establish this exception are: "(1) declarant was an agent or employee of the party opponent; (2) the declarant made the statement while employed by the principal; and (3) the statement *concerned a matter within the scope of the agency or employment." Sehl v. Vista Linen Rental Serv. Inc.*, 763 A.2d 858, 862 (Pa. Super. 2000). (emphasis in original) These elements were clearly proven, assuming defendants were "party opponents."

Additional defendants argued this hearsay exception did not apply since the hearsay evidence was offered against the additional defendants, which was plaintiffs only "opponent" in the case at the time of trial, defendants Dr. Kostin and Harrisburg Hospital having settled. They argue that since Dr. Rhodes was not the additional defendants' agent or employee, but rather the defendants, his hearsay did not fall under the exception provided in Rule 803(25)(D).

The issue of whether a defendant who has settled, but remains active in the case, remains a "party opponent" for purposes of this rule, appears one never addressed in Pennsylvania. Nevertheless, I concluded the defendants were a party opponent since they participated in the case[4] and, most importantly, the jury was asked to render a verdict on their liability.

Additional defendants also argue that even if Dr. Rhodes' notes were properly offered against defendants Dr. Kostin and Harrisburg Hospital, they were still inadmissible against the additional defendants and as such, this court should have, sua sponte, delivered a curative instruction to the jury. The relevant Rule of Evidence on this issue provides as follows:

*"Rule 105. Limited admissibility*

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon re-

---

4. The participation of defendants Dr. Kostin and Harrisburg Hospital, through counsel, included providing an opening and closing statement (N.T. 11/22/01 32-41), the questioning of Dr. Kostin on a limited basis following plaintiffs' extensive examination of him (as of cross) (N.T. 1/23/01 vol. I 5-69, 89-91), providing a short examination of additional defendant Dr. Keyser (N.T. 1/24/01 196-98) and a short examination of additional defendants' anesthesiologist expert, Dr. Laucks. (N.T. 1/24/01 96-97.) Defense counsel also raised at least two objections during the course of the trial. (N.T. 1/23/01 vol. I 52, 66.) Counsel did not cross-examine any of the three Harrisburg Hospital nurses presented by plaintiffs (N.T. 12, 20, 28) nor plaintiffs' expert surgeon, Dr. Fleishman. (N.T. 1/24/01 52.) Defense counsel did not independently call any witnesses and at the conclusion of trial, informed the court and the jury, that all the witnesses defendants would have called had been previously called. (N.T. 1/25/01 37.)

quest shall, or on its own initiative may, restrict the evidence to its proper scope and instruct the jury accordingly." Pa.R.E. 105.

As set forth in Rule 105, the court is given discretionary authority to sua sponte submit a curative instruction. Additional defendants have provided no authority for the proposition that this court's failure to act is reversible error, particularly where nothing precluded additional defendants from requesting the same.

The additional defendants also seek a judgment n.o.v. Specifically, they contend that plaintiffs failed to present sufficient evidence of improper arm positioning wherein plaintiffs offered only a single standard of care witness on that point and that his testimony contradicted that of all the operating room participants. Additional defendants assert no two reasonable minds could have differed that Mrs. Sweikert's arm was properly positioned.

A judgment n.o.v. can be entered where the evidence is insufficient to support the verdict. *Lilley v. Johns-Manville Corp.,* 408 Pa. Super. 83, 91, 596 A.2d 203, 206 (1991), *appeal denied,* 503 Pa. 644, 607 A.2d 254 (1992). It is an extreme remedy which is properly entered only where the facts are so clear that no two reasonable minds could fail to agree that the verdict was improper. *Id.* 408 Pa. Super. at 91, 596 A.2d at 207. In considering a judgment n.o.v. motion, we must consider the evidence and all inferences which are reasonably deducible from the evidence in a light most favorable to the verdict winner. *Id.* A motion for judgment n.o.v. may also be entered where the movant is entitled to judgment as a matter of law. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).

Plaintiffs' burden at trial was to prove by a preponderance of evidence that the additional defendants owed Mrs. Sweikert a duty of care, breached its duty, that the breach was the legal cause of Mrs. Sweikert's injury and that Mrs. Sweikert suffered an actual loss. *Hightower-Warren v. Silk,* 548 Pa. 459, 463, 698 A.2d 52, 54 (1997). In order to succeed on its judgment n.o.v. motion, additional defendants had to convince this court that plaintiffs failed to satisfy each element of the cause of action. *Ludmer v. Nernberg,* 433 Pa. Super. 316, 323-24, 640 A.2d 939, 943 (1994).

The evidence and all its reasonable inferences, viewed most favorably to plaintiffs, supported the jury's verdict. Dr. Martin Gerald Fleishman, a general surgeon who testified as plaintiffs' expert, stated that he had no doubt that Mrs. Sweikert suffered from a stretch injury and that proper surgical positioning would have prevented such an injury. (N.T. 1/24/01 36.) He opined that Mrs. Sweikert's arm could not have been in the position as described by Drs. Kostin and Keyser since it would have been impossible to insert the stapling device through the midaxillary port (armpit) to the lung apex due to the size of the stapling device. (N.T. 1/24/01 47.) He concluded her arm must, therefore, have been positioned at an angle significantly greater than 90 degrees. (N.T. 1/24/01 51.) While this testimony contradicted that of additional defendant Dr. Keyser, defendant Dr. Kostin and two defendant hospital nurses who assisted with the surgery,[5] the jury could conclude otherwise, based upon Dr. Fleishman's testimony:

---

5. See N.T. 1/23/01 vol. I 64, 88, 97-98; 1/23/01 vol. II 11, 24, 28-29; 1/24/01 92, 178.

"Judgment n.o.v. . . . 'may *not* be employed to invade the province of the jury.' *Collincini v. Honeywell Inc.,* 411 Pa. Super. 166, 172, 601 A.2d 292, 294 (1991). . . . Thus, when there is a question of fact to be resolved, it is within the sole purview of the jury. . . . Judgment n.o.v. should not be entered where evidence is conflicting upon a material fact. . . . Thus, where the jury has been presented with conflicting evidence, a motion for judgment n.o.v. should be denied." *Rohm and Haas Co. v. Continental Casualty Co.,* 732 A.2d 1236, 1248 (Pa. Super. 1999). (citations omitted)

### *Plaintiffs' Post-Trial Motion*[6]

Plaintiffs take issue with the jury's finding that defendant Harrisburg Hospital (Pinnacle Health) was allocated 45 percent of the causal negligence when, according to plaintiffs, the proof at trial did not in any way establish their negligence. Thus, plaintiffs seek a new trial limited to determination of comparative fault or alternatively, that the court grant judgment n.o.v. in favor of Harrisburg Hospital and remit its negligence, proportionally reassigning it to defendant Dr. Kostin and the additional defendants, such that Dr. Kostin would be held 78 percent liable and Dr. Keyser, Glamm Anesthesia Services and Anesthesia Associates of Pennsylvania 22 percent liable.

---

6. Plaintiffs' motion was titled, in full, "Motion for judgment n.o.v. or, in the alternative, a remittitur as to the jury's 45 percent allocation of negligence for defendant Pinnacle Health Systems d/b/a Pinnacle Health at Harrisburg Hospital and reapportionment of percentage of fault or grant of new trial limited to apportionment of negligence."

Plaintiffs argue that the only possible negligence that could be the joint responsibility for the three defendant entities found liable was improper arm positioning. Plaintiffs note that the undisputed facts indicated that positioning was the responsibility of either Dr. Kostin solely or Dr. Kostin and Dr. Keyser jointly.[7] The only hospital employee potentially involved in positioning was a circulating nurse. However, plaintiffs contend there was no evidence she had anything to do with positioning, thus, no reasonable jury could have assigned her (the hospital) a greater percentage than the anesthesiologist.

In reviewing a jury's verdict, we must presume it was consistent unless there is no reasonable theory to support the verdict. *McDermott v. Biddle,* 544 Pa. 21, 25, 674 A.2d 665, 667 (1995). Plaintiffs assume that the jury based its verdict solely upon their theory that Mrs. Sweikert's arm was malpositioned. We do not know, however, if the jury found malpositioning the sole cause of injury. The jury may well have factored into its verdict other potential causes, including causes which implicated the actions of Dr. Rhodes. The jury may have found credible testimony that the insertion of a surgical instrument may have caused a contusion to Mrs. Sweikert's brachial plexus. (N.T. 1/24/01 92, 95, 129-30.) Dr. Rhodes, defendant hospital's chief resident, assisted Dr. Kostin with the surgical instrumentation since the surgery required the simultaneous manipulation of three instruments. (N.T. 1/24/01 70-71.) There was also testimony that the chest tube may have been placed too high

---

7. See N.T. 1/23/01 vol. I 85, 88; 1/24/01 44-45, 56, 74-75, 208; 1/25/01 11-12.

or inserted too far and could have caused a contusion or compression injury to Mrs. Sweikert's brachial plexus. (N.T. 1/24/01 92-94, 132-33, 135, 194-95.) The chest tube was inserted preoperatively by Dr. Rhodes and after it was removed for surgery, was reinserted postoperatively, probably by Dr. Rhodes. (N.T. 1/24/01 76-77, 195.) Thus, the jury's verdict was not inconsistent with the testimony and plaintiffs' request for a new trial or judgment n.o.v. and a remittitur were rejected.[8]

Accordingly, this court issued an order May 25, 2001, denying both parties' post-trial motions.

---

8. Attempting to speculate on a jury's reasoning in reaching a verdict is a challenging task. See generally, Stephen J. Adler, *The Jury* (1994). Nevertheless, one possible reason the jury assigned defendant hospital 45 percent of the causal negligence was that it (along with its co-defendant Dr. Kostin) provided no representatives in court other than counsel and presented no witnesses. (See n.4.) The jury, noting this apparent half-hearted defense and unaware defendants had settled, may have found that justice warranted apportioning 90 percent of the verdict against them. Defendants' trial tactic, if it was such, permitted the additional defendants to deflect liability back to defendants Dr. Kostin and the hospital without costing these defendants an additional cent and potentially reducing the additional defendants' liability.